In re the MARRIAGE OF Sara Jane SPIEGEL and A.J. Spiegel.

Upon the Petition of Sara Jane Spiegel, Appellee,

And Concerning

A.J. Spiegel, Appellant.

No. 95–422.

Supreme Court of Iowa.

Sept. 18, 1996.

Steven H. Lytle and Randall G. Horstmann of Nyemaster, Goode, McLaughlin, Voigts, West, Hansell & O'Brien, P.C., Des Moines, for appellant.

Timothy S. White, Allison M. Heffern, and Sherry L. Schulte of White & Johnson, P.C., Cedar Rapids, for appellee.

TERNUS, Justice.

This appeal challenges the economic provisions of a dissolution of marriage decree. Unlike the district court, we find the parties' prenuptial agreement to be enforceable, and hence reverse and remand.

## I. *Background Facts and Proceedings.*

A.J. Spiegel met Sara Jane Williams in 1978; they began dating the next year. Both parties had been previously married and divorced and both had children from these prior marriages. At the time of trial A.J. was fifty years of age and Sara was forty-seven. Their respective children were adults.

Sara graduated from high school in 1965 and earned a bachelor of arts degree in merchandising and design in 1969. She then worked as a salaried interior decorator. In 1983 Sara started her own interior decorating business and while doing so completed a masters degree program in textile design. Her business has shown relatively little profit, generating no more than $4000 of net income in its best year.

In contrast A.J., through Herculean efforts beginning long before the parties' marriage, started and developed an extremely successful business. When the parties married, this business, the Mi–T–M Company (Mi–T–M), reported total assets in excess of $13 million, with A.J. having a net worth of more than $2.8 million.

The parties became engaged in 1983, but delayed setting a wedding date. Sara broke the engagement sometime in 1986 when she heard rumors A.J. was seeing other women. The parties soon reconciled and again became engaged within several months. Again no wedding date was set.

In February 1988, A.J. first brought up the idea of a prenuptial agreement. Although it was untrue, he told Sara his bankers, lawyers, and accountants felt he needed such an agreement to protect financing for a Mi–T–M construction project. Sara flatly rejected the suggestion, stating under no circumstances would she be married with a prenuptial agreement. A.J. dropped the matter for the time being.

In May 1988, the couple set a wedding date for July 30, 1988. A.J. did not bring up the subject of a prenuptial agreement again until approximately ten days before the scheduled wedding. Sara became upset and stated she had not changed her mind. A.J.

again dropped the subject but, without telling Sara, he continued prior discussions with his advisors, and directed his legal counsel to draft a prenuptial agreement and mail it to Sara.

When Sara received the document only five days prior to the wedding, she was decimated. She immediately phoned A.J. and asked why he was doing this to her. A.J. falsely repeated that a prenuptial agreement was not his idea but that of his business advisors. He tried to comfort Sara, explaining the agreement was just a piece of paper, that it would never come between them, and it was just to get the bankers "off his back."

The prenuptial agreement sent to Sara covered the parties' financial relationship and rights both during the marriage and in the event the marriage terminated due to death or dissolution. It basically waived any rights to which Sara would be entitled under Iowa law. The separate property of each would remain separate and any property acquired after the marriage would remain the separate property of the person who acquired it, except for any property specifically purchased in joint tenancy. The agreement also provided each party's salary would be considered separate property and the parties would maintain separate bank accounts for purposes of segregating their finances. Finally, the agreement eliminated the right to support or alimony in the event of dissolution.

A.J. told Sara to consult an attorney, and offered to pay the fee. In accordance with A.J.'s prompting, Sara employed legal counsel immediately and met with her attorney the next day. Sara's counsel explained each provision of the agreement to her, pointing out his concerns. He told her, "This agreement basically says that you get nothing."

In the short time available before the wedding, Sara's attorney was able to negotiate three changes: (1) Sara's right to a spousal statutory share of A.J.'s estate in the event of his death would not be waived in the agreement; (2) title to the couple's new home would be in joint tenancy and Sara would be entitled to one-half of the furnishings of the home; and (3) Sara would have title to the automobile she drove. Although Sara's attorney also sought concessions in the provi-

sions dealing with Sara's rights in the event of dissolution, A.J. would not agree to any changes in that area. Sara's counsel told her before she signed the agreement that he had asked for a provision allowing alimony if the parties' marriage was dissolved and A.J. had refused to allow such a provision.

During the days of negotiation, Sara informed her attorney of A.J.'s representations that his financial advisors wanted the prenuptial agreement and the agreement was just a piece of paper and would not come between them. Her attorney warned her the agreement contained a provision stating the prenuptial agreement constituted "the entire agreement of the parties and no representations, terms, provisions, conditions or exceptions exist except those expressly set forth herein." He told her that because A.J.'s representations were not included in the document, they would not be considered legally binding and the agreement could be enforced against her in a dissolution proceeding.

On the afternoon of July 29, less than twenty-four hours prior to the wedding, Sara, A.J., and their respective counsel attended a tense and emotional meeting. A.J. represented to Sara that he had never actually read the terms of the agreement. For that reason Sara had her attorney read the agreement aloud line-by-line in A.J.'s presence, hoping that when he heard it and realized its import he would not ask her to sign the agreement. When reading the document failed to change A.J.'s mind, she turned to him and asked if this was what *he* really wanted (referring to her signing the agreement). When he replied "yes," Sara signed. Although Sara's attorney thought A.J. was unfair, her attorney did not think Sara signed the agreement under duress, fraud or undue influence.

A.J. and Sara were married the following day, July 30, 1988. Their marriage was rocky almost from the beginning. More fruitful, however, was A.J.'s business. During the parties' six-year marriage, A.J.'s net worth increased from $2.8 million to $9.6 million. A.J. earned over $800,000 in salary from Mi–T–M in 1993. That year the company had net sales of $9.4 million and net

income of $494,546. Sara's net worth, valued at $39,250 at the time of the marriage, increased slightly due to her joint ownership of the marital home.

During the marriage, the parties abided by the prenuptial agreement. They maintained separate finances and did not commingle their assets or incomes. At one point, Sara attempted to obtain additional financial assistance from her first husband for their daughters' college expenses. During that proceeding, she relied on the prenuptial agreement to show the limited funds that were available to her from A.J.

Sara filed a petition for separate maintenance on April 14, 1994, after A.J. stopped paying Sara any money to meet the monthly household expenses. A.J. counterclaimed for dissolution of the marriage. Following trial, the district court refused to enforce the prenuptial agreement, finding it was gained through fraud, duress, and undue influence. The decree awarded Sara a lump sum property distribution of $2,000,000 with an initial payment of $250,000, the remainder payable in monthly installments over five years, with interest of ten percent per annum. A.J. was also ordered to pay Sara $7000 per month alimony until either party's death or Sara's remarriage. The alimony obligation would terminate if A.J. retired, provided he did not retire until he was sixty-five years of age. A supplemental decree awarded A.J. possession of the marital home. Sara was also awarded $15,000 for attorney fees. The case is before us on A.J.'s appeal. Our review is de novo. Iowa R.App. P. 4.

## II. *Property Distribution.*

A.J. argues the trial court erred by failing to enforce the prenuptial agreement. Enforcement of the agreement would have the effect of depriving Sara of any interest in A.J.'s property. Iowa Code section 598.21(1) expressly permits the court to consider the provisions of a prenuptial agreement when deciding equitable property division issues. Iowa Code § 598.21(1) (1993). Thus, our first task is to determine the validity of the prenuptial agreement signed by A.J. and Sara.

■ A. *Enforceability of prenuptial agreements.* Iowa cases have long held prenuptial agreements are favored in the law. *E.g., In re Marriage of Winegard,* 278 N.W.2d 505, 512 (Iowa), *cert. denied,* 444 U.S. 951, 100 S.Ct. 425, 62 L.Ed.2d 321 (1979); *Norris v. Norris,* 174 N.W.2d 368, 369 (Iowa 1970); *In re Estate of Parish,* 236 Iowa 822, 830, 20 N.W.2d 32, 37 (1945); *In re Estate of Mansfield,* 185 Iowa 339, 342, 170 N.W. 415, 416 (1919). The purpose of such agreements is to "fix and determine the interest that the parties have respectively in the property of the other." *In re Estate of Onstot,* 224 Iowa 520, 526, 277 N.W. 563, 566–67 (1938). The motivation for a prenuptial agreement may vary from case to case, but often such agreements protect the interests of children by former marriages, *Parish,* 236 Iowa at 830, 20 N.W.2d at 37, and by doing so, settle property questions that might otherwise cause dissension in the marriage, *Mansfield,* 185 Iowa at 342, 170 N.W. at 416. The Wisconsin Supreme Court aptly described the useful function of prenuptial agreements:

> They allow parties to structure their financial affairs to suit their needs and values and to achieve certainty. This certainty may encourage marriage and may be conducive to marital tranquility by protecting the financial expectations of the parties. The right to enter into an agreement regulating financial affairs in a marriage is important to a large number of citizens.

*In re Marriage of Button,* 131 Wis.2d 84, 388 N.W.2d 546, 550 (1986); *see Parish,* 236 Iowa at 832, 20 N.W.2d at 37 (such agreements "prevent strife, secure peace, adjust rights, and settle the question of marital rights in property"); *Lungren v. Lungren,* 197 Iowa 519, 521, 197 N.W. 646, 647 (1924) (where parties have previously been married and have children from these prior marriages, a prenuptial agreement "makes for the peace of the respective families, and this means the peace of the contracting parties, as well").

■ We have said prenuptial agreements are entitled to the same consideration and construction as other contracts. *E.g., Christians v. Christians,* 241 Iowa 1017, 1021, 44 N.W.2d 431, 433 (1950); *Onstot,* 224 Iowa at

525, 277 N.W. at 566. Nevertheless, our cases have imposed requirements which appear to qualify this general statement.

In an early Iowa case, we held the court will examine a prenuptial agreement to determine whether its terms were unjust or unreasonable. *Fisher v. Koontz,* 110 Iowa 498, 500, 80 N.W. 551, 551 (1899). If the contract is unjust or unreasonable, the burden is on the proponent of the agreement to show it "was fairly procured." *Id.; accord Rankin v. Schiereck,* 166 Iowa 10, 15, 147 N.W. 180, 182 (1914). Where the agreement is "fairly and honestly made," it is enforceable like any other contract. *In re Estate of Uker,* 154 Iowa 428, 433, 134 N.W. 1061, 1063 (1912). Stating the same rule in a different way, we have said when parties enter into a prenuptial agreement in the absence of fraud, mistake or undue influence, the contract is binding. *Mansfield,* 185 Iowa at 342, 170 N.W. at 416; *see Britven v. Britven,* 259 Iowa 650, 656, 145 N.W.2d 450, 454 (1966) (agreement enforceable if "entered into freely"). The test to be gleaned from these cases is that agreements that are substantively unfair are still binding if they were executed in a procedurally fair manner.

For unexplained reasons, the test for establishing the validity of a prenuptial agreement was stated differently in *In re Estate of Shepherd,* 220 Iowa 12, 19, 261 N.W. 35, 39 (1935). In that case, the elements of substantive and procedural fairness were not stated as alternative requirements: "if fair on its face *and* free from fraud, [a prenuptial agreement] is as legal and enforceable as other contracts." *Shepherd,* 220 Iowa at 19, 261 N.W. at 39 (emphasis added). A case decided ten years later stated the test in a more expansive way: "If an antenuptial contract is not unfair, inequitable, or unconscionable on its face, *and* there has been no fraud or overreaching or deceit practiced in its being obtained, it should stand." *Parish,* 236 Iowa at 831, 20 N.W.2d at 36 (emphasis added). The most recent version of this rule is stated in *Norris:* "The courts will uphold [prenuptial agreements] if they are fair between the parties and fairly, freely and understandingly entered into." *Norris,* 174 N.W.2d at 369. Thus, our most recent cases

appear to require substantive *and* procedural fairness for the validity of a prenuptial agreement.

We have been unable to find a clear statement in the Iowa cases of the test for substantive fairness. A review of our cases shows, however, that over time our appellate courts have become increasingly reluctant to declare an agreement unreasonable. For example, in the 1899 *Fisher* case, the court appeared to conclude the prenuptial contract was unfair because it deprived the wife of all her marital rights. *Fisher,* 110 Iowa at 500, 80 N.W. at 551 (court considered procedural fairness in execution of agreement, apparently concluding contract terms were unjust and unreasonable). Just fifteen years later, however, the court was reluctant to declare a contract unreasonable even though it deprived the wife of any interest in her husband's estate:

> From the whole record, which we have carefully read, we reach the conclusion that Mrs. Emanuel knew of the terms of the marriage contract, freely entered into it, uninfluenced by fraud or deceit, and that we have not the right to say that it should not be binding.

*Rankin,* 166 Iowa at 20, 147 N.W. at 183. Noting the wife had provided faithful and devoted care to her invalid husband, the court observed such care "merits compensation, stating a moral view, but does not warrant us, as a means of providing it, to declare invalid an instrument limiting [the wife's] rights which to us seems to have been fairly entered into." *Id.,* 147 N.W. at 183

Continuing this liberal approach to fairness in the 1945 *Parish* decision, we held an agreement that gave the wife a "meager" allowance upon the husband's death was not unfair. *Parish,* 236 Iowa at 833, 837, 20 N.W.2d at 37, 38. Noting the wife "had lived in humble circumstances" before the marriage, the court concluded that "from a purely financial angle, [the wife] gained by the marriage." *Id.* at 836, 20 N.W.2d at 38, 39. In a more recent case decided by our court of appeals, the court upheld a prenuptial agreement in which "each party waived all rights in the other's property and waived all rights of election to take against the other's will."

*In re Estate of Ascherl,* 445 N.W.2d 391, 392 (Iowa App.1989). The husband died, making no provision for his wife in his will. *Id.* The court concluded the contract was not unjust or unenforceable, even though the wife was left with nothing, noting the waiver of rights in the agreement was mutual. *Id.* at 392–93.

Our courts' gradual minimization of the extent to which we will review the terms of an agreement for fairness and equity may reflect the difficulty and arbitrariness of the task. As the Wisconsin courts have noted, "[s]ubstantive fairness is an amorphous concept which must be determined on a case-by-case basis." *Greenwald v. Greenwald,* 154 Wis.2d 767, 454 N.W.2d 34, 40 (App.1990). Although the Wisconsin Supreme Court has recited an elaborate list of factors to consider, *see Button,* 388 N.W.2d at 551, the court of appeals acknowledged in *Greenwald* that "[r]arely, we suspect, will application of these factors lead to a clearly indicated resolution." *Greenwald,* 454 N.W.2d at 41. The Supreme Court of Pennsylvania has simply eliminated any inquiry into the fairness of the agreement:

> By invoking inquiries into reasonableness, however, the functioning and reliability of prenuptial agreements is severely undermined. Parties would not have entered such agreements, and, indeed, might not have entered their marriages, if they did not expect their agreements to be strictly enforced. If parties viewed an agreement as reasonable at the time of its inception, as evidenced by their having signed the agreement, they should be foreclosed from later trying to evade its terms by asserting that it was not in fact reasonable. . . .
>
> . . . .
>
> We are reluctant to interfere with the power of persons contemplating marriage to agree upon, and to act in reliance upon, what *they* regard as an acceptable distribution scheme for their property. A court should not ignore the parties' expressed intent by proceeding to determine whether a prenuptial agreement was, in the court's view, reasonable at the time of its inception or the time of divorce. These are

exactly the sorts of judicial determinations that such agreements are designed to avoid. Rare indeed is the agreement that is beyond possible challenge when reasonableness is placed at issue.

*Simeone v. Simeone,* 525 Pa. 392, 581 A.2d 162, 166 (1990) (court's emphasis); *accord Chiles v. Chiles,* 779 S.W.2d 127, 129 (Tex. App.1989) ("Parties should be free to execute agreements as they see fit and whether they are 'fair' is not material to their validity."), *overruled on other grounds by Twyman v. Twyman,* 855 S.W.2d 619, 624 n. 15 (Tex. 1993).

A.J. has not suggested in this appeal that we abandon our requirement of substantive fairness. Consequently, that issue is not before us. Nevertheless, the observations of the Wisconsin court in attempting to apply an *intense* review of the substantive fairness of prenuptial agreements and the Pennsylvania court in rejecting *any* review for substantive fairness highlight the difficulties inherent in evaluating substantive fairness. These inherent difficulties also confirm the wisdom of the uncomplicated approach taken in our later appellate cases that consider an agreement substantively fair if its obligations and waivers are mutual or the economically disadvantaged party receives a financial improvement in his or her pre-marriage circumstances.

Our procedural fairness test—"fairly, freely and understandingly entered into"—reflects the usual concern that any waiver of rights be knowing and voluntary. *See In re Marriage of Smith,* 537 N.W.2d 678, 681 (Iowa 1995) ("Waiver is the 'intentional or voluntary relinquishment of a known right.'"); *Anderson v. Low Rent Hous. Comm'n,* 304 N.W.2d 239, 249 (Iowa 1981) (Lavorato, J., dissenting) ("Waiver is generally defined as the voluntary and intentional relinquishment of a known right."). Consistent with principles of waiver, we have always required a full disclosure or independent knowledge of the nature and extent of the parties' assets to ensure the agreement was fairly procured. *E.g., Britven,* 259 Iowa at 657, 145 N.W.2d at 454; *Christians,* 241 Iowa at 1021, 44 N.W.2d at 433; *Rankin,* 166 Iowa at 15, 147 N.W. at 181.

In summary, the rules governing the validity of prenuptial agreements are as follows.[1] The person challenging the agreement must prove its terms are unfair or the person's waiver of rights was not knowing and voluntary. Applying the standard of our recent cases, we hold the terms of an agreement are fair when the provisions of the contract are mutual or the division of property is consistent with the financial condition of the parties at the time of execution. Of course, the affirmative defenses of fraud, duress and undue influence are also available to void a prenuptial agreement, as with any other contract. *Rankin*, 166 Iowa at 15, 147 N.W. at 181.

Our liberal test of substantive fairness combined with the requirement of a knowing and voluntary waiver strikes a proper balance between the two competing interests at stake. First we are sensitive to the traditional desire to protect the party waiving valuable property rights from doing so without a full knowledge and understanding of the import of his or her actions. On the other hand, we must respect the right of competent persons to contract as they wish. Under the test stated above, Iowa courts will not be called upon to judge the moral fairness of the agreement and in doing so, assume the role of guardian for one of the parties.

With these legal principles in mind, we turn to the contentions of the parties in this case.

A. *Fairness of agreement and its procurement.* Sara argues the terms of the prenuptial agreement are inequitable and unfair to her because she gave up nearly everything to which she would normally be entitled under the law. On our de novo review we conclude Sara has not carried her burden to show the agreement is unfair.

First, we decline Sara's implicit suggestion that in such cases we review the circumstances of the parties to decide if she was given "enough" to satisfy our sense of fairness. See *Woolwine v. Woolwine*, 519 So.2d 1347, 1350 (Ala.Civ.Ct.App.1987) (unfairness "does not relate to the amount awarded to a spouse pursuant to an antenuptial agreement"); *Cladis v. Cladis*, 512 So.2d 271, 274 (Fla.Dist.Ct.App.1987) (the fact one party made a bad bargain is insufficient to vacate an antenuptial agreement); *Rose v. Rose*, 526 N.E.2d 231, 235 (Ind.App.1988) ("Antenuptial agreements are not per se unconscionable simply because the effect of the document is to leave the spouse with little."). To adopt such a standard would require us to declare invalid any prenuptial agreement that constituted a bad fiscal bargain for one party. As we discussed earlier, we will not so grossly interfere with the parties' freedom to contract.

Turning to the prenuptial agreement at issue here, we note Sara did not forfeit all marital rights: she retained her statutory rights in the event of A.J.'s death and received a joint interest in the marital home. As a result of this latter provision, Sara's net worth increased during the marriage.

Moreover, the relinquishment of marital rights in the event of dissolution was mutual, as were all other provisions of the agreement. See *Ascherl*, 445 N.W.2d at 393 (finding agreement containing mutual waivers fair); *Gentry v. Gentry*, 798 S.W.2d 928, 936 (Ky.1990) (premarital agreement not unconscionable where it applied equally to both parties even though their respective financial conditions were disparate). There is no rule of law requiring A.J. to share his wealth simply because he had more to share than did Sara. See *Peet v. Peet*, 81 Iowa 172, 178, 46 N.W. 1051, 1052 (1890) (holding meager provision for wife in prenuptial agreement not unfair despite husband's wealth, noting, "The circumstances did not call for special liberality on the part of [the husband]."); *In re Estate of Garbade*, 633 N.Y.S.2d 878, 879–80 (N.Y.App.Div.1995) (applying normal contract rules to and upholding prenuptial agreement between wealthy construction ex-

---

1. The enforceability of prenuptial agreements executed on or after January 1, 1992, are governed by Iowa Code chapter 596. Under that chapter, premarital agreements are not enforceable if the person challenging the agreement did not execute it voluntarily, the agreement was unconscionable when executed, or the other party did not make a fair and reasonable disclosure of his or her property or financial obligations. Iowa Code § 596.8 (1995).

ecutive and wife who had no assets wherein wife waived community property rights and elective share of husband's estate).

■ Sara has also failed to show she did not sign the agreement knowingly and voluntarily. She had independent counsel who informed her in detail of the rights she was giving up and the consequences of signing the agreement. As we discuss more fully below in the divisions dealing with duress and undue influence, Sara signed the agreement voluntarily, albeit reluctantly.

■ Sara argues the agreement did not assure that A.J. had fully disclosed the nature and extent of his assets to her prior to her execution of the contract. A list of A.J.'s assets and debts was attached to the contract; the agreement stated, however, that the values of A.J.'s property, particularly Mi–T–M, may be greatly in excess of the valuations shown on the exhibit. Neither Sara nor her attorney expressed any desire to have a more formal appraisal done of A.J.'s holdings; nor does Sara complain on appeal that the valuations on the exhibit were wrong. In fact, she relies on the net worth shown on the exhibit attached to the prenuptial agreement to support her claim the value of A.J.'s assets appreciated tremendously during the marriage. We have never required that a party have precise valuations of the other's assets; a general knowledge of the true nature and extent of the other's properties is sufficient. *E.g., Christians,* 241 Iowa at 1020, 44 N.W.2d at 433 (husband told wife he owned farms, but it was hard to give an exact value "because there are differences of opinion as to that at any given time"); *Fisher,* 110 Iowa at 500, 80 N.W. at 551 (wife had actual knowledge of husband's property because she had visited his farms); *Ascherl,* 445 N.W.2d at 393 (wife had adequate knowledge of husband's property where she had dated him for a year and had visited his farm several times prior to their marriage); *accord Woolwine,* 519 So.2d at 1350 (general knowledge of the extent of spouse's estate is sufficient); *Rose,* 526 N.E.2d at 236 (sufficient disclosure where wife knew husband owned a drywalling business and was told she would be giving up "a lot" by signing the agreement, even though wife did not know

actual value of business); *Taylor v. Taylor,* 832 P.2d 429, 430–31 (Okla.App.1991) (sufficient if spouse has "a generally accurate knowledge of [other spouse's] worth"). We conclude A.J. made an adequate disclosure of his financial condition.

■ We certainly do not admire A.J.'s lack of forthrightness in blaming others for the motivation behind the agreement. Neither do we admire the timing utilized in presenting Sara with the dilemma of canceling a wedding or submitting to the agreement. Pressure put on Sara, and its timing, may be criticized as unkind, but cannot be deemed illegal. *See In re Marriage of Sell,* 451 N.W.2d 28, 30 (Iowa App.1989) (husband's unilateral decision to seek preparation of a prenuptial agreement, and his decision to escort his soon-to-be wife to his attorney's office and "surprise" her with this agreement less than two weeks before their wedding day not deemed unfair).

C. *Fraud.* Fraud requires proof that Sara justifiably relied on A.J.'s representations. *See Beeck v. Kapalis,* 302 N.W.2d 90, 94 (Iowa 1981); *Lockard v. Carson,* 287 N.W.2d 871, 878 (Iowa 1980). Whether a person's reliance is reasonable is determined subjectively: "whether the complaining party, in view of his own information and intelligence, had a right to rely on the representations." *Lockard,* 287 N.W.2d at 878.

■ Sara claimed at trial that if she had known A.J. wanted the prenuptial agreement "for himself," she would not have signed the agreement. She also asserted she thought A.J. would never enforce the agreement. We find Sara's reliance on A.J.'s statements unjustified. First, her attorney advised her the agreement could be held binding notwithstanding anything A.J. said privately.

Second, A.J. never told her he would not enforce the prenuptial agreement. To the contrary he was not only insistent that she sign the agreement, he refused her requests to modify the provisions dealing with her rights upon dissolution. Moreover, minutes before Sara signed the agreement, A.J. finally acknowledged to her that *he,* not just the bankers and accountants, wanted the agreement.

As Sara acknowledged at trial, A.J.'s representations prior to her signing the agreement were in essence that the agreement would not interfere with their marriage or their happiness. Of course, that is presumably the intent and hope of all couples who enter into such an agreement. It can hardly be equated with a representation that if these hopes are not realized, the document will have no effect on the terms of a dissolution. In other words, saying the prenuptial agreement will not affect the parties' relationship is not the same as saying it will not affect the termination of that relationship. Thus, Sara has failed to prove she justifiably relied on A.J.'s representations in signing the prenuptial agreement.

D. *Duress.* We follow the Restatement's rule concerning the effect of duress on the enforceability of a contract: " 'If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim.' " *Turner v. Low Rent Hous. Agency,* 387 N.W.2d 596, 598 (Iowa 1986) (quoting Restatement (Second) of Contracts § 175(1), at 475 (1981)). An essential element of duress is the victim had no reasonable alternative to entering into the contract. *Id.* at 598–99. Here, Sara had a reasonable alternative—she could have canceled the wedding. Although she may have suffered embarrassment in doing so, we do not think social embarrassment from the cancellation of wedding plans, even on the eve of the wedding, renders that choice unreasonable. *See Howell v. Landry,* 96 N.C.App. 516, 386 S.E.2d 610, 618 (1989) (holding no duress where wife presented with prenuptial agreement on eve of wedding, noting she was not obligated to go through with the ceremony).

Another essential element of duress is that the threat be wrongful or unlawful. *In re C.K.,* 315 N.W.2d 37, 43–44 (Iowa 1982). A.J.'s threat here, albeit unspoken, was he would not marry Sara if she did not sign the prenuptial agreement. We find this threat neither wrongful nor unlawful. *Liebelt v. Liebelt,* 118 Idaho 845, 801 P.2d 52, 55 (App. 1990) ("The threat of a refusal to marry is not wrongful in the eyes of the law."); *Le-*

*beck v. Lebeck,* 118 N.M. 367, 881 P.2d 727, 734 (App.1994) (husband's statement that he would not marry wife without prenuptial agreement was a lawful demand and would not support a claim of duress); *Gardner v. Gardner,* 190 Wis.2d 216, 527 N.W.2d 701, 706 (App.1994) (insistence on a premarital agreement as a condition of marriage is not a "threat" and is not coercive); *see Howell,* 386 S.E.2d at 617–18 (no duress even though husband-to-be threatened to cancel the wedding: "the cancellation of a proposed marriage would be a natural result of a failure of a party to execute a premarital agreement desired by the other party"); *Taylor,* 832 P.2d at 431 (duress not shown by proof husband refused to marry wife unless she signed the agreement). For these reasons, Sara has failed to show she acted under duress in signing the prenuptial agreement.

E. *Undue influence.* Undue influence is influence that deprives one person of his or her freedom of choice and substitutes the will of another in its place. *Stetzel v. Dickenson,* 174 N.W.2d 438, 443 (Iowa 1970); *Stephenson v. Stephenson,* 247 Iowa 785, 797, 74 N.W.2d 679, 686 (1956). "[M]ere importunity that does not go to the extent of controlling the will of the grantor does not establish undue influence." *Knigge v. Dencker,* 246 Iowa 1387, 1391, 72 N.W.2d 494, 496 (1955). Freedom from undue influence is presumed. *In re Estate of Huston,* 238 Iowa 297, 299, 27 N.W.2d 26, 28 (1947).

We do not find clear and convincing evidence in the record before us to support a finding Sara executed the prenuptial agreement as the result of undue influence. The discussion of the court in *Stetzel,* holding undue influence did not exist as a matter of law, is instructive:

> The fact that the adjuster was boorish and intruded upon plaintiff's privacy is not significant unless it resulted in depriving [plaintiff] of her independence of action and substituted his will for hers at the time the release was signed. There is a total absence of evidence that it did. In fact the record proves conclusively to the contrary.
>
> Plaintiff places great importance on her testimony that she did not want to sign.

This is by no means the same as saying undue influence was exercised upon her. Plaintiff was a well educated, highly intelligent young lady. Her scholastic record was outstanding. Before signing the release she sought independent advice from her landlady, in whom she apparently had considerable confidence, and from an Iowa City lawyer—not counsel now representing her—whose help she now denounces. Whether his advice was good or bad is not the question we here consider. The fact that she sought and received independent advice is a proper matter to consider on the question of undue influence.

In addition to all this is the testimony heretofore set out in which plaintiff concedes she knew the purpose of the instrument, read it, understood it, and realized its consequences before signing. We hold all these circumstances refute undue influence as a matter of law.

*Stetzel,* 174 N.W.2d at 443.

■ We reach the same conclusions here. There is no evidence A.J.'s will was substituted for Sara's own judgment in deciding to sign the prenuptial agreement. *See Liebelt,* 801 P.2d at 55 (threatening to cancel marriage did not make wife do what she did not want to do so as to constitute undue influence). Sara is an intelligent, well-educated business woman. She had the advice of competent counsel. "[S]he knew the purpose of the instrument, read it, understood it, and realized its consequences before signing." *Stetzel,* 174 N.W.2d at 443. Under these circumstances, Sara did not prove undue influence.

We conclude the prenuptial agreement is binding on Sara. Sara's regret at having signed the agreement will not prevent its enforcement against her. This holding makes it unnecessary for us to consider A.J.'s challenge to the trial court's property settlement. That settlement must be in accordance with the prenuptial agreement.

III. *Alimony.*

■ The $7000 monthly alimony award is the subject of a separate assignment. The right to this award, as mentioned, was also waived in the agreement, but requires special analysis. Formerly, and again at the present time, provisions waiving alimony in prenuptial agreements were and are void. But A.J. contends the provision in this agreement was written during a window of time when such a provision was allowed.

In *Vande Kop v. McGill,* 528 N.W.2d 609, 613 (Iowa 1995), we noted that prior to 1980, alimony waivers were considered void as against public policy, but this common-law rule was modified when an amendment to Iowa Code section 598.21 allowed courts to consider them. In 1992, as a part of the uniform premarital agreement act, Iowa Code section 596.5(2) was adopted, reestablishing our prior rule prohibiting these provisions. 1991 Iowa Acts ch. 77, § 5.

■ We think the window claimed by A.J. should not call for enforcement of the waiver here. Contrary to A.J.'s contentions our *Vande Kop* holding did not mandate, but merely made permissible, consideration of a waiver provision in prenuptial contracts. We thus turn to the question whether alimony is appropriate under the facts here.

■ Alimony is a stipend to a spouse in lieu of the other spouse's legal obligation for support. *In re Marriage of Francis,* 442 N.W.2d 59, 62 (Iowa 1989). Alimony is not an absolute right, and an award thereof depends upon the circumstances of a particular case. *In re Marriage of Fleener,* 247 N.W.2d 219, 220 (Iowa 1976). When making or denying an alimony award, the trial court considers the factors set forth in Iowa Code section 598.21(3). Although our review of the trial court's award is de novo, we accord the trial court considerable latitude in making this determination and will disturb the ruling only when there has been a failure to do equity. *In re Marriage of Benson,* 545 N.W.2d 252, 257 (Iowa 1996).

■ The amount of the alimony award here was substantial. Sara argues the award was reasonable when compared to other cases where the payor spouse had a high income. *See In re Marriage of Steele,* 502 N.W.2d 18, 22 (Iowa App.1993) (spouse with annual income of approximately $110,000 ordered to pay $1500 per month in permanent

alimony); *In re Marriage of Misol,* 445 N.W.2d 411, 413–14 (Iowa App.1989) (spouse with annual income of $330,000 ordered to pay alimony of $3500 per month in addition to child support); *In re Marriage of Hayne,* 334 N.W.2d 347, 350–51 (Iowa App.1983) (spouse with annual income of $240,000 ordered to pay $4000 per month in permanent alimony). In each of these cases, however, the marriage was of considerable duration, twenty years, twenty-two years, and thirty-four years, respectively. Here, in contrast, the marriage lasted a mere six years.

 In addition to the length of the marriage, it is appropriate for us to consider the age and health of the parties, their educational level and earning capacity, the feasibility of the party seeking alimony becoming self-supporting at a comparable standard of living, any property distribution made in the decree, the tax consequences and the provisions of any prenuptial agreement. Iowa Code § 598.21(3). Notably, section 598.21(3) does not include in its list of factors the premarital relationship of the parties. Consequently, even though Sara emphasizes the emotional support she gave A.J. during their lengthy courtship, we give no consideration to this support even though it probably enhanced A.J.'s efforts to build the wealth he now enjoys. *See Greenwald,* 454 N.W.2d at 42–43 (premarital relationship between parties was irrelevant to property division and support determinations in dissolution proceeding).

We think the substantial alimony award made by the trial court is inappropriate when all relevant factors are considered. The marriage was relatively brief. Sara is well-educated, owns her own business and is in good health. The parties agreed in the prenuptial agreement that Sara would receive no support from A.J. if the marriage was dissolved. On the other hand, during the parties' marriage, Sara refrained, at A.J.'s urging, from developing her business. Without doubt the marked success of A.J.'s business career from 1988 to 1994 must be ascribed to his own talent and enterprise. But A.J. solicited Sara's commitment to support him emotionally, socially and domestically in his career and she obliged—to A.J.'s admitted advantage.

In view of all the foregoing we think Sara should be awarded alimony, but we modify the trial court's award by reducing the amount of alimony from $7000 to $3000 per month. Alimony shall be payable from the date of the decree but should terminate ten years thereafter, or when Sara dies, remarries, or cohabitates with a person of the opposite sex.

### IV. *Attorney Fees.*

 Sara requests attorney fees on appeal. An award of attorney fees is not a matter of right; rather, it rests within the discretion of the court. *Francis,* 442 N.W.2d at 67. The court considers the financial positions of the parties and whether the party making the request was obligated to defend the trial court's decision on appeal. *See In re Marriage of Williams,* 303 N.W.2d 160, 167 (Iowa 1981).

We think an allowance of appellate attorney fees is appropriate here. On remand the trial court should determine the amount of appellate attorney fees incurred by Sara for this appeal and award her one-half of such fees to be paid by A.J. in addition to the $15,000 previously allowed for services in district court.

### V. *Temporary Alimony.*

The final issue raised by this appeal concerns whether our court had jurisdiction to award Sara temporary alimony during the pendency of this appeal. The issue arose this way. As previously mentioned, A.J. was ordered to pay Sara alimony in the amount of $7000 per month commencing February 1, 1995, until either one of the parties dies or Sara remarries or cohabitates with a person of the opposite sex, whichever occurs first. After filing his notice of appeal, A.J. filed a motion for supersedeas bond pursuant to Iowa Rule of Appellate Procedure 7 seeking a stay of execution of all spousal support becoming due between April 1, 1995, and April 30, 1996. The district court allowed A.J. to post a $150,000 bond and thereby stay all enforcement proceedings to collect support from April 1, 1995, through May 1, 1996,

and attorney fees. Thereafter, on June 16, 1995, Sara filed an application for temporary alimony with our court. In a single-justice order, we denied the application. We, however, ordered the following issue to be submitted with the appeal: whether and under what circumstances this court has jurisdiction to award temporary alimony pending appeal.

 The general rule is that an appellee may invoke the power of the district court to enforce a decree while its correctness is being appealed, unless a supersedeas bond is filed. *Lutz v. Darbyshire*, 297 N.W.2d 349, 352 (Iowa 1980), *overruled on other grounds by Phillips v. Iowa Dist. Ct.*, 380 N.W.2d 706, 709 (Iowa 1986). In this case, A.J. filed a supersedeas bond, and therefore, without an order from this court, Sara could not enforce the alimony provision of the decree during the pendency of the appeal. We frequently remand these matters for the district court to rule on them, but the issue now before us is whether we have authority to address the merits of the alimony application.

There is express statutory authority under Iowa Code section 598.11 for a *district* court to award temporary spousal support, but this section is silent as to the power of our court to award alimony during appeal. Nevertheless, we have held we have the inherent authority to grant such applications as an exercise of our constitutional mandate to "issue all writs and process necessary to secure justice to parties" under article V, section 4 of our constitution. *See Shors v. Shors*, 133 Iowa 22, 26, 110 N.W. 16, 18 (1906) (suit money for appeal).

In *Scheffers v. Scheffers*, 241 Iowa 1217, 44 N.W.2d 676 (1950), we said that

the present rule in this state and generally seems to be that after appeal in a divorce or separate maintenance case the trial court has no further jurisdiction over the controversy until some part thereof is remanded for further action. Accordingly, any further allowances to the wife during pendency of the appeal cannot be made by the trial court but must be made by us.

*Scheffers*, 241 Iowa at 1227, 44 N.W.2d at 681.

It is generally held that appellate courts as well as trial courts have jurisdiction of an application for temporary alimony and suit money while an appeal is pending, and the courts of a few jurisdictions go to the extent of holding that the jurisdiction of the appellate court is exclusive. In many instances the power of an appellate court to allow temporary alimony and counsel fees has been held to be inherent. Such decisions have been based on the ground that the jurisdiction to review decrees of divorce carries with it by implication the incidental power to make such allowances, since they are necessary to enable a spouse to maintain rights on appeal.

24 Am.Jur.2d *Divorce and Separation* § 548, at 564 (1983).

 We conclude we have the authority to grant alimony pending appeal and, in the interest of expediency, we address the merits of the application here rather than to order a remand. We affirm the single-justice order denying the application for temporary alimony. As mentioned, the district court allowed A.J. to post a $150,000 supersedeas bond and thereby stay all enforcement proceedings to collect support from April 1, 1995, through May 1, 1996. Unless a party seeking temporary alimony pending appeal shows a need for such alimony, we think the opposing party should have the benefit of a supersedeas bond to stay enforcement of a decree for alimony. Here, A.J. had already paid Sara $250,000 as part of the property award and an additional $14,000 in alimony for February and March 1995. Given this total amount of payment, we think Sara has failed to show a need for any temporary alimony pending appeal.

## VI. *Summary.*

We hold the prenuptial agreement is enforceable. Therefore, any property division must be in accordance with that agreement. We remand to the district court to determine Sara's interest in any joint property. We modify the district court's award of alimony by reducing it from $7000 to $3000 and as modified, affirm the award of alimony. We award Sara one-half her appellate attorney fees. We affirm the single-justice order de-

nying Sara's application for temporary alimony during the appeal. Costs are taxed one-half to each party.

**AFFIRMED IN PART AS MODIFIED, REVERSED IN PART, AND REMANDED.**

All justices concur except HARRIS and SNELL, JJ., who dissent and CARTER, J., who takes no part.

HARRIS, Justice (dissenting).

I respectfully dissent because I agree with the district court's refusal to enforce the antenuptial agreement. Taking the facts outlined by the majority, I would find that A.J.'s conduct and timing robbed Sara of a fair ability to reject the agreement. Notwithstanding the availability of legal counsel, I think she was, because of A.J.'s conduct, not equipped to accept her lawyer's advice.

Because the majority prevails on this issue, it would be meaningless for me to explore whether the trial court's property division was or was not appropriate.

I think, in view of Sara's extensive contributions and A.J.'s earning capacity, alimony of $7000 per month is appropriate and should be permanent.

SNELL, J., joins this dissent.