**IN THE COURT OF APPEALS OF IOWA**

No. 21-0438
Filed March 2, 2022

**IN RE THE MARRIAGE OF JOHN G. SNYDER, JR.**
**AND BETH K. SNYDER**

**Upon the Petition of**
**JOHN G. SNYDER, JR.,**
        Petitioner-Appellee,

**And Concerning**
**BETH K. SNYDER,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Buchanan County, Bradley J. Harris,

Judge.


        A former spouse appeals from a decree of dissolution of marriage, claiming

the district court improperly enforced a premarital agreement and awarded an

insufficient duration of spousal support.  **AFFIRMED.**


        Alexander S. Momany and Mark D. Fisher of Howes Law Firm, P.C., Cedar

Rapids, for appellant.

        Benjamin M. Lange of Swisher & Cohrt, P.L.C., Independence, for appellee.


        Heard by May, P.J., and Schumacher and Badding, J.J.

**SCHUMACHER, Judge.**

Beth Phillips, formerly known as Beth Snyder, appeals from a decree dissolving her marriage to John Snyder. She claims the district court improperly enforced a premarital agreement and awarded her insufficient spousal support. Both Beth and John request an award of appellate attorney fees. On our de novo review, we find the district court properly enforced the premarital agreement and awarded Beth an equitable amount of spousal support. We decline an award of appellate attorney fees. Accordingly, we affirm.

## I.    Background Facts & Proceedings

Beth and John began dating and living together in 1991. Beth was a registered respiratory therapist. Her license lapsed in 2003. John has worked for ADM Corn Processing since 1997, most recently as a production supervisor. John and Beth resided together until 2003 and then separated. They reconciled in 2004. Upon their reconciliation, Beth moved into John's home. Beth, at John's urging, went through bankruptcy proceedings when the parties reconciled to discharge debts from a previous marriage. Beth also began a new job at Walmart.

John proposed to Beth in February 2005, with plans to be married in Las Vegas in April of the same year. John, concerned with Beth's financial mismanagement, contacted an attorney in early March to draft a premarital agreement. While both parties agree that John indicated the agreement was a necessary condition to marriage, they disagree over what would happen had Beth refused to sign the agreement. Beth contends it would have ended the relationship altogether, while John suggests Beth's refusal would simply maintain the status quo and they would have continued the relationship as an unmarried couple.

Beth and John met with John's attorney in mid-March. They both read the agreement and hand-wrote lists of assets and liabilities for the disclosure statement.[1] While values were not assigned to the assets and liabilities, John wrote a note on the agreement indicating that his attorney had complete financial statements available for Beth to view. The premarital agreement largely sought to keep John and Beth's property separate, obtained both prior to and during the marriage.

John's attorney recommended Beth obtain her own counsel, which she did. Beth, through her attorney, requested a slight modification to the agreement, allowing her to keep her engagement ring and wedding band if the marriage lasted for a period of five years. The agreement was executed on March 31, and John and Beth were married on April 2. When they executed the agreement, they had booked airline tickets and invited a few family members to the wedding, but they had not reserved a chapel.

During their marriage, both parties were employed and kept separate bank accounts. They remained residing in John's home for the duration of their marriage. John paid the mortgage and the majority of shared costs, including the purchase of additional land around the home and renovation costs. Beth paid some of the household expenses, specifically the electric and cable/phone bill. Both John and Beth had adult children from previous marriages. No minor children resided with John and Beth after the parties married. At the time of the divorce proceedings, John earned substantially more than Beth. After working for

---

[1] Beth's disclosure does not list individual assets and liabilities, stating only that both were minimal due to a recent bankruptcy filing.

Walmart, Beth worked briefly for Goodwill where she earned about $40,000 a year. She left Goodwill to work at Alpha in late 2020, making approximately $20,000 a year.[2] John earns roughly $110,000 a year.

John and Beth separated in August 2019. A trial was held on John's petition for dissolution of the marriage and Beth's counterclaim on February 5, 2021. The court entered its decree on February 24, finding the premarital agreement controlled the distribution of property, resulting in John receiving the property in his name and Beth receiving the property in her name. The property held as joint tenants was divided equally. The court ordered that John pay $2000 a month in spousal support for thirty months. John was also ordered to pay the remainder of Beth's attorney fees in the amount of $5162.50. This award was in addition to the previous temporary attorney fee award in Beth's favor. Beth filed a motion pursuant to Iowa Rule of Civil Procedure 1.904 for reconsideration of the court's decree, which was denied. Beth now appeals, attacking the property distribution and spousal support provisions of the decree.

## II.     Standard of Review

"Dissolution proceedings are equitable actions, which we review de novo." *In re Marriage of Shanks*, 758 N.W.2d 506, 510 (Iowa 2008). Our de novo review extends to "issues concerning the validity and construction of premarital agreements." *Id.* at 511. The party challenging the validity of the agreement bears the burden of proving it is unenforceable. *In re Est. of Kloster*, No. 20-1245, 2021 WL 3076546, at *2 (Iowa Ct. App. July 21, 2021). While our review of spousal

---

[2] Beth's reduced salary, at least in part, stems from a voluntary reduction in hours to spend more time with her grandchildren.

support is also de novo, "we accord the trial court considerable latitude." *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015) (quoting *In re Marriage of Olson*, 705 N.W.2d 312, 319 (Iowa 2005)). "We will disturb the trial court's order 'only when there has been a failure to do equity.'" *Id.* (quoting *Olson*, 705 N.W.2d at 315).

## III. Analysis

Beth raises several claims on appeal. First, she alleges the premarital agreement is unenforceable. She also claims the district court should have awarded her traditional spousal support. Both parties request an award of appellate attorney fees.

### A. Enforceability of the Prenuptial Agreement

"In general, premarital agreements 'are favored in the law and should be construed liberally to carry out the intention of the parties." *In re Estate of Rhoten*, No. 18-0753, 2019 WL 1056831, at *2 (Iowa Ct. App. Mar. 6, 2019) (quoting *In re Marriage of Van Brocklin*, 468 N.W.2d 40, 45 (Iowa Ct. App. 1991)). Such "agreements are construed, considered, and treated in the same manner as ordinary contracts." *Id.* Iowa Code section 596.8 (2021) provides three grounds for challenging the enforceability of a premarital agreement: (1) the agreement was not entered into voluntarily; (2) the agreement was unconscionable when executed; and (3) the person challenging the agreement's validity was not provided a "fair and reasonable" disclosure of the other spouse's property and obligations, and the person "did not have, or reasonably could not have had, an adequate knowledge of the" other spouse's financial assets and obligations. Beth challenges the enforceability of the agreement on all three grounds.

### 1. Voluntariness

Our supreme court has recognized two avenues for establishing an agreement was involuntary: duress and undue influence. *See Shanks*, 758 N.W.2d at 512. Duress renders an agreement unenforceable when "(1) one party issues a wrongful or unlawful threat and (2) the other party had no reasonable alternative to entering the [agreement]." *Id.* "Undue influence is influence that deprives one person of his or her freedom of choice and substitutes the will of another in its place." *In re Marriage of Spiegel*, 553 N.W.2d 309, 318 (Iowa 1996) *superseded by statute on other grounds as recognized by Shanks*, 758 N.W.2d at 512.

Beth claims she acted under duress because of the temporal proximity to the wedding and her belief that John would terminate the relationship if she refused. John testified that the premarital agreement was a condition to the marriage. However, our courts have consistently held such an ultimatum is not unlawful. *See Shanks*, 758 N.W.2d at 512-13*; Spiegel*, 553 N.W.2d at 318 ("A.J.'s threat here . . . was he would not marry Sara if she did not sign the prenuptial agreement. We find this threat neither wrongful nor unlawful."). We have also previously held that temporal proximity to the wedding day does not render an agreement unenforceable so long as the party has adequate time to meaningfully consider the contract. *Compare In re Marriage of Elam*, No. 03-0221, 2004 WL 370247, at *2 (Iowa Ct. App. Feb. 27, 2004) ("Even if Ed had only seen the agreement the day prior to the wedding, as he claims, such would be insufficient, standing alone, to invalidate it."), *with In re Marriage of Maifield*, No. 03-0326, 2004 WL 61108, at *2 (Iowa Ct. App. Jan. 14, 2004) (finding an agreement that was

"couched in legalistic terms and would not necessarily be understandable to a lay person," which was presented the night before the wedding while the spouse was entertaining guests, "provided no meaningful opportunity to seek counsel" and was therefore unenforceable).

Additionally, cancelling the wedding is generally a reasonable alternative despite the temporal proximity to the wedding day and potential social embarrassment cancellation may cause. *Shanks*, 758 N.W.2d at 512-13. That is particularly true here, where Beth had time to obtain counsel and consider the terms of the agreement, only a handful of family members were invited, and the chapel had not been reserved yet. *See In re Marriage of Holtkamp*, No. 17-0940, 2018 WL 5292084, at *3 (Iowa Ct. App. Oct. 24, 2018) (finding that cancellation is a reasonable alternative particularly for a "very small wedding").

While Beth testified to her belief that John would end their relationship if she refused to sign the agreement, John testified that he simply would have cancelled the wedding and the parties would have continued dating and cohabitating. The district court implicitly found John to be the more credible witness.[3] We give weight to the district court's credibility assessments. *See Shanks*, 758 N.W.2d at 511. Moreover, Beth and John had a lengthy history of cohabitating prior to marriage, indicating it was a reasonable alternative. Accordingly, we find that John did not unlawfully threaten Beth to sign the agreement, and that Beth had the reasonable

---

[3] For instance, the court found that the parties had not reserved a chapel at the time of executing the premarital agreement based on John's testimony despite Beth's testimony to the contrary.

alternative of cancelling the wedding and maintaining the status quo of cohabitating.

Similarly, Beth fails to establish undue influence. Beth had time to review the agreement and obtain independent legal counsel. Moreover, Beth, through her counsel, requested and obtained at least one revision to the agreement. Again, John's insistence that the marriage was conditioned on the agreement, as well as the short time until the wedding, is inadequate to demonstrate an "improper or wrongful constraint, machination, or urgency of persuasion required for a finding of undue influence." *See id.* at 513 (quotation and citation omitted). Finally, Beth does not suggest that John misinformed or tried to influence her understanding of the terms of the agreement. *See, e.g.*, *In re Marriage of Gonzalez*, 561 N.W.2d 94, 97 (Iowa Ct. App. 1997) (finding an agreement unenforceable because one spouse relied on the translation of the contract by the other spouse, which caused a fundamental misunderstanding of the terms and importance of the contract). Consequently, Beth failed to establish that she entered into the agreement involuntarily.[4]

### 2. Unconscionability

"The concept of unconscionability includes both procedural and substantive elements." *Shanks*, 758 N.W.2d at 515. Procedural unconscionability generally arises from "'sharp practices[,] the use of fine print and convoluted language,' as well as 'a lack of understanding and inequality of bargaining power.'" *Id.* (alteration

---

[4] Beth's claim that her attorney suggested most spouses "will tear up the prenup after [eight] years" similarly does not render the contract involuntary because John never suggested the contract would cease to be in effect at some point in the future.

in original) (quoting *Rite Color Chem. Co. v. Velvet Textile Co.*, 411 S.E.2d 645, 648 (N.C. Ct. App. 1992)). In contrast, substantive unconscionability is found when the terms of an agreement "are so harsh or oppressive 'such as no [person] in [their] senses and not under delusion would make' such a bargain." *Id.* at 516 (alterations in original) (quoting *Casey v. Lupkes*, 286 N.W.2d 204, 207 (Iowa 1979)). Beth alleges the premarital agreement was both procedurally unconscionable—largely for the same reasons as her voluntariness claims—and substantively unconscionable due to John receiving a majority of the assets.

In determining procedural unconscionability, we consider several factors, including the party challenging the agreement's opportunity to seek independent counsel, the "relative sophistication of the parties in legal and financial matters," the temporal proximity of the agreement to the wedding day, and the use of confusing or technical language. *Id.* at 517. Beth had the opportunity to, and in fact did, seek independent counsel. While the agreement was presented to Beth close to the wedding, she had the opportunity to seek counsel, understand the terms, and propose alterations to the agreement. *Compare Shanks*, 758 N.W.2d at 518 (finding that the presentment of the agreement that was temporally close to the wedding date did not render the agreement procedurally unconscionable when the complaining party had enough time to seek counsel), *with Holtkamp*, 2018 WL 5292084, at *4 (noting the temporal proximity was significant because it limited the party's opportunity to obtain counsel). And while both parties agreed John was more financially savvy than Beth, the agreement did not use highly technical or confusing language, nor did it utilize "sharp practices" like fine print. *See Kloster*, 2021 WL 3076546, at *2-3 (finding that the challenging party failed to establish

procedural unconscionability where the contract language was not highly technical and they had an opportunity to obtain counsel despite their relative lack of financial and legal sophistication). Accordingly, the agreement was not procedurally unconscionable.

Similarly, the agreement is not substantively unconscionable. Our courts have recognized that "premarital agreements are typically financially one-sided in order to protect the assets of one prospective spouse." *Shanks*, 758 N.W.2d at 516. "Courts must resist the temptation to view disparity between the parties' financial circumstances as requiring a finding of substantive unconscionability." *Id.* Instead, "the focus of the substantive unconscionability analysis is upon whether 'the provisions of the contract are mutual or the division of property is consistent with the financial condition of the parties at the time of execution." *Id.* (quoting *Spiegel*, 553 N.W.2d at 316).

Here, "[t]he agreement basically sought to maintain the parties' premarital assets as separate property and to perpetuate their premarital financial conditions throughout the marriage." *Id.* John had substantially more assets than Beth at the time of the agreement's execution, in part due to her recent bankruptcy, but also his frugal approach to finances. The instant division of property is consistent with the parties' relative financial conditions when the agreement was executed. The agreement was mutual—both parties kept their respective assets separate. That John is receiving the lion's share of the assets does not render the agreement substantively unconscionable.

### 3. Fair Disclosure

Beth alleges that John did not provide a fair and reasonable disclosure of his assets because he did not assign specific values to the listed assets. In order for a premarital agreement to be unenforceable on this ground, Beth must establish that (1) John did not "provide a fair and reasonable disclosure" of his property and financial obligations, and (2) she "did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of" John. Iowa Code § 596.8. Her claim fails on both elements.

First, "[w]e have never required that a party have precise valuations of the other's assets; a general knowledge of the true nature and extent of the other's properties is sufficient." *Rhoten*, 2019 WL 1056831, at *3 (quoting *Spiegel*, 553 N.W.2d at 317). The requirement of fair disclosure is not an exacting one. *Id.* While John did omit one pension account, Beth similarly forgot to include a retirement account provided by her employer. And both parties testified they were aware the other had retirement accounts through their respective employers. John adequately listed his assets, and the agreement included the means by which she could obtain further financial documents that would include specific valuations. Beth never inquired further into the financial documents, but they were reasonably available to her.

Beth also testified that she knew John was employed and was aware he received retirement benefits from his job, although she did not know the exact value of either his income or retirement accounts. *See Holtkamp*, 2018 WL 5292084, at *5 (finding a spouse had adequate knowledge when she had a general knowledge of her partner's assets). She had lived at John's home since reuniting

in 2004. We have noted that cohabitation can show the party's general knowledge of the other spouse's financial position. *In re Marriage of Crawford*, No. 04-0770, 2004 WL 2805269, at *3 (Iowa Ct. App. Dec. 8, 2004). While Beth testified that she did not know much of anything about John's finances, going so far as to say that John prohibited her from knowing anything about them, the length of their cohabitation—since 1991, with a short separation in 2003-2004—suggests she had plenty of opportunity to acquire the knowledge of John's finances. She was additionally provided an opportunity to review John's financial statements prior to the marriage. The premarital agreement also contained warranties that both parties were "fully acquainted with the other's means, resources, and income." *See In re Marriage of Miller*, No. 01-1973, 2002 WL 31312840, at *2 (Iowa Ct. App. Oct. 16, 2002) (finding prior cohabitation and similar contractual language in the agreement showed the spouse had adequate knowledge of the other's assets). The premarital agreement is thus enforceable.

### 4.    Equity

Beth claims that even if the premarital agreement is otherwise valid, we should render it unenforceable because it is inequitable. The sole case she cites in support of this proposition is *In re Marriage of McDermott*, 827 N.W.2d 671 (Iowa 2013). However, that case does not hold that an otherwise valid premarital agreement may be unenforceable merely because it is inequitable. Rather, the case recognizes the long-standing practice of dividing property obtained through gifts and inheritance between divorcing spouses when equity requires it. *McDermott*, 827 N.W.2d at 678-79. Moreover, the case does not discuss premarital agreements. Beth's assertion lacks support in our case law.

Beth's contention also appears to provide an alternative, less stringent standard for substantive unconscionability. Rather than focusing on whether the provisions are mutual and consistent with the parties' financial positions when the contract is executed, Beth would have this court look to whether the actual property division was fair. This is directly contrary to our well-established case law. *See Shanks*, 758 N.W.2d at 516 ("Courts must resist the temptation to view disparity between the parties' financial circumstances as requiring a finding of substantive unconscionability.").

Additionally, allowing a premarital agreement to be defeated because it is inequitable is contrary to the statutory language of section 596.8. That section delineates three methods of demonstrating the unenforceability of a premarital contract: the party did not enter into it voluntarily, the contract is unconscionable, or a lack of fair disclosure. The legislature could have included additional equitable considerations, but did not. Thus, Beth's claim is not supported by statute or case law, and must fail.

## B. Spousal Support

Beth claims the district court incorrectly limited her award of spousal support to a period of thirty months.[5] The district court ordered John to pay $2000 a month for thirty months as a form of rehabilitative or transitional support. Beth contends the court should have entered an award of traditional support, making the

---

[5] John contends Beth was not entitled to any spousal support. However, John failed to raise the issue as a cross-appeal. Consequently, we cannot consider it. *See Craft v. State*, No. 12-0290, 2013 WL 1224099, at *2 (Iowa Ct. App. Mar. 27, 2013) ("A party that neither appeals nor cross-appeals can have no greater relief or redress on appeal than was accorded it by the trial court.") (quoting *Boyd v. Boyd & Boyd, Inc.*, 386 N.W.2d 540, 544 (Iowa Ct. App. 1986)).

payments last until her death. Beth does not challenge the amount of the monthly award. She points to the earning disparity between herself and John and the length of their marriage as reasons for permanent support.

"[W]e accord the trial court considerable latitude" in spousal support decisions. *Gust*, 858 N.W.2d at 406 (quoting *Olson*, 705 N.W.2d at 319). As a result, "[w]e will disturb the trial court's order 'only when there has been a failure to do equity.'" *Id.* (quoting *Olson*, 705 N.W.2d at 319). There is no absolute right to spousal support. *In re Marriage of Hansen*, No. 17-0889, 2018 WL 4922992, at *8 (Iowa Ct. App. Oct. 10, 2018). Further, "[f]inancial need, in and of itself, is not sufficient reason to justify an award of spousal support." *In re Marriage of Gutcher*, No. 17-0593, 2018 WL 5292082, at *5 (Iowa Ct. App. Nov. 7, 2018). We look to the particular facts of the case, recognizing that "precedent may be of little value in deciding each case." *Gust*, 858 N.W.2d at 408. When considering an award of spousal support, we are guided by the factors set out in Iowa Code section 598.21A(1), including the length of the marriage, age and physical health of the parties, property distribution, earning capacity, and the ability of the party seeking an award to earn enough to support a "standard of living reasonably comparable to that enjoyed during the marriage."

Our supreme court recently addressed how alterations to tax law have impacted awards of alimony:

> Under recently enacted federal tax law, alimony payments are no longer tax deductible and are not considered taxable income to the person receiving them. Tax Cuts and Jobs Act, Pub. L. No. 115–97, § 11051, 131 Stat. 2054, 2089 (2017) (repealing 26 U.S.C. § 215). As a result, the economic impact of alimony on the paying spouse is greater today than it has been in the past. Prior caselaw allocating percentages of income for alimony thus have less economic impact

on the payor than the allocation of a similar percentage of income to alimony would have today under current tax law. Thus, by way of example, in *Gust*, we awarded alimony that amounted to 31% of the difference in income between the spouses. 858 N.W.2d at 412. If the case were before us today on the same facts, a 31% award would have a larger impact on the payor spouse in *Gust* because of the tax law change.

*In re Marriage of Mann*, 943 N.W.2d 15, 21 (Iowa 2020).

The district court did not fail to do equity by awarding Beth rehabilitative support rather than traditional support. Beth and John were married for about fifteen years, which is below the twenty-year threshold that generally merits traditional support.[6] *Gust*, 858 N.W.2d at 410-11. Additionally, this court has noted that an income disparity is not on its own a reason to award traditional alimony when the financially dependent party is capable of self-support: Traditional or permanent alimony is usually only payable for life or for so long as the dependent spouse is incapable of self-support. That is not the case here.

The fact one party may generate more income than the other is not the controlling factor in the alimony award where both parties have the education and potential to supply for themselves a very adequate living. *In re Marriage of Borden*, No. 09-1148, 2010 WL 1050012, at *4 (Iowa Ct. App. Mar. 24, 2010); *see also In re Marriage of Hazen*, 778 N.W.2d 55, 61 (Iowa Ct. App. 2009) ("Consequently, if both parties are in reasonable health, as here, they need to earn up to their capacities in order to pay their own present bills and not lean unduly on the other party for support."). We note that Beth's earning potential, even absent further

---

[6] That Beth and John's relationship lasted about twenty-four years is not relevant because the statute instructs us to look at the length of the marriage, not the length of a relationship or cohabitation. *See In re Marriage of Ruiz*, No. 09-0179, 2009 WL 2392393, at *4 (Iowa Ct. App. Aug. 6, 2009).

education, is substantially higher than her present income.[7] *See Borden*, 2010 WL 1050012, at *4 (noting that the court should consider not just present income but future earning capacity). Consequently, she can earn enough to be self-supporting. While we recognize it is unlikely Beth will earn enough to have the same living standard she enjoyed while married to John, the code instructs us to consider a standard of living *reasonably comparable* to that of the marriage. *See* Iowa Code §598.21A(1)(f). Thus, even ignoring the durational threshold, traditional alimony is improper given Beth's ability to support herself.

The award achieves the purpose of rehabilitative support by "supporting [the] economically dependent spouse through a limited period of re-education or retraining." *In re Marriage of Becker*, 756 N.W.2d 822, 826 (Iowa 2008) (quoting *In re Marriage of Francis*, 442 N.W.2d 59, 63 (Iowa 1989)). The award allows Beth to obtain the two-year degree necessary to pursue a career in medical coding and billing or office management, which Beth indicated she was interested in pursuing. Those degrees would boost her earning capacity, further reducing the necessity for ongoing support. See *id.* ("The goal of rehabilitative spousal support is self-sufficiency . . . ."). Therefore, the district court appropriately weighed the factors in section 598.21A when it awarded Beth spousal support of $2000 a month for thirty months. The district court award was equitable.

## C. Appellate Attorney Fees

Both parties request an award of attorney fees on appeal. "An award of attorney fees is not a matter of right, but rests within the court's discretion and the

---

[7] While Beth makes roughly $20,000 a year at Alpha, she has earned approximately $40,000 a year at Goodwill last year.

parties' financial position." *In re Marriage of Kohorst*, No. 19-0147, 2020 WL 564934, at *6, (Iowa Ct. App. Feb. 5, 2020). We "consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the district court's decision on appeal." *Id.* (citing *In re Marriage of Ales*, 592 N.W.2d 698, 704 (Iowa 1999)). Considering these factors, we decline to award appellate attorney fees to either party.

**AFFIRMED.**