**In the Interest of C. K., A Minor.**

**Appeal of ROBERT and Kimberly, natural parents.**

No. 66336.

Supreme Court of Iowa.

Jan. 20, 1982.

As Corrected Feb. 23, 1982.

Gregory M. Lederer of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for appellants.

Thomas M. Collins, Jr. and Patrick M. Roby of Shuttleworth & Ingersoll, Cedar Rapids, for intervenors-appellees.

Considered by LeGRAND, P. J., and HARRIS, ALLBEE, McGIVERIN, and LARSON, JJ.

LARSON, Justice.

Kimberly and Robert, the natural parents of C. K., appeal from an order terminating their parental rights under chapter 600A, The Code 1979, following a petition for termination filed by the child's guardian. The prospective adoptive parents, who had intervened on the side of the petitioner for termination, are the appellees. The natural parents contend (1) their release of custody, § 600A.4, was invalid; (2) they had effectively revoked it within the 96 hours provided by section 600A.4(4); (3) that even if not revoked within that period "good cause" had been shown for revocation in the juvenile court, § 600A.4(4); and (4) that the best interests of C. K. dictate their parental rights not be terminated. We affirm the termination order of the juvenile court.

C. K. was born on February 12, 1980, in the state of New Hampshire, where both of his parents resided. Kimberly, his mother, was seventeen years old and Robert, his father, was twenty-two at the time of his birth. After their release from the hospital Kimberly and the baby stayed with Robert in the couple's apartment for two nights. The child's maternal grandparents and great-grandparents cared for him until the end of February, when Kimberly and Robert brought him back to their apartment for one day. A family friend then offered to care for the child and did so for five weeks. During this five-week period, Kimberly became concerned about what to do with the baby; the marriage was in trouble and she and Robert were experiencing serious financial problems. Under the circumstances she felt it might be best to release the child for adoption. Kimberly went to see a lawyer about that possibility and consulted with him on two or three occasions. On April 3 or 4, 1980, her grandmother contacted Fred Potter, an attorney serving as president of an insurance company, pursuant to a suggestion of the grandmother's minister, concerning the possibility of adoption. The grandmother then arranged for Kimberly's father to meet with Potter, which he subsequently did, to explain the circumstances to him.

On April 15, Kimberly, Robert, and Kimberly's grandparents went to the office of John Ransmeier, a former law partner of Potter, to start the release proceedings. After discussion of the release form, and the desirability of adoption, the parents signed it, took a copy with them, and left. The next day, April 16, Kimberly called Potter and, according to her, revoked the

release. According to Potter she did not indicate a desire to revoke the release at that time. Kimberly called Potter again on April 25 and at that time it is undisputed she told him she wanted to revoke it.

In the meantime the prospective adoptive parents, Linda and Greg, who were relatives of Potter, came from Iowa and brought the child back with them. The child has resided with them since. Termination proceedings were commenced in Iowa, and notice of the termination hearing was served on Kimberly and Robert. The matter proceeded to hearing in juvenile court in September, 1980. The potential adoptive parents subsequently intervened with the petitioner for termination. The natural parents resisted the termination and, following the adverse ruling, appealed. Our review is de novo. *See In re Adoption of Gibson*, 239 N.W.2d 540, 542 (Iowa 1975) (adoption consent).

I. *Sufficiency of the release form.*

■ Section 600A.4(2), prescribes the form and content of a release of custody:

A release of custody:

a. Shall be accepted only by an agency or a person making an independent placement.

b. Shall not be accepted by a person who in any way intends to adopt the child who is the subject of the release.

c. Shall be in writing.

d. Shall be signed, not less than seventy-two hours after the birth of the child to be released, by all living parents.

e. Shall be witnessed by two persons familiar with the parent-child relationship.

f. Shall name the person who is accepting the release.

g. Shall be followed, within a reasonable time, by the filing of a petition for termination of parental rights under section 600A.5.

h. Shall state the purpose of the release, shall indicate that if it is not revoked it may be grounds for termination, and shall fully inform the signing parent of the manner in which a revocation of the release may be sought.

The natural parents appear to concede the release complied with all of these requirements except subsection (h). They contend the release was defective in that it did not "fully inform" them of the manner in which a revocation of the release may be sought. *See* § 600A.4(2)(h).

The revocation of a release is governed by section 600A.4(4):

[A] parent who has signed a release of custody . . . may, at any time prior to the entry of an order terminating parental rights request the juvenile court designated in section 600A.5 to order the revocation of any release of custody previously executed by either parent. If such request is by a signing parent, and is within ninety-six hours of the time such parent signed a release of custody, the juvenile court shall order the release revoked. Otherwise, the juvenile court shall order a release or releases revoked only upon clear and convincing evidence that good cause exists for revocation. Good cause for revocation includes but is not limited to a showing that the release was obtained by fraud, coercion, or misrepresentation of law or fact which was material to its execution.

This section thus mandates revocation by the juvenile court if requested to do so by a signing parent within 96 hours; thereafter it may be revoked upon showing of good cause. (The good-cause basis of revocation will be discussed later.)

The release form signed by Kimberly and Robert followed section 600A.4(4) in advising them of their right of revocation. In this respect, the release form stated:

IN THE IOWA DISTRICT COURT FOR LINN COUNTY, IOWA

(Juvenile Division)

\*    \*    \*    \*    \*    \*

REVOCATION

The parent(s) of the above, named child is/are hereby informed that a parent who signs a Release of Custody *may petition,*

*within the time prior to the hearing on termination of parental rights, or may request, at the hearing on termination of parental rights, the Juvenile Court to order this Release revoked.* The Court shall order such Release revoked if a parent petitions to have such Release revoked within Ninety-Six (96) hours of signing the Release. Otherwise, the Juvenile Court shall order the Release revoked only upon clear and convincing evidence that good cause exists for revocation. Good cause for revocation includes but is not limited to a showing that the Release was obtained by fraud, coercion, or misrepresentation of law or fact which was material to its execution.

(Emphasis added).

The natural parents contend the right of revocation was not adequately explained in the release form, in part because it states a parent may "petition" for revocation prior to hearing or "request" it at the hearing, whereas section 600A.4(4) provides that the parent need only "request" the revocation prior to entry of the order terminating parental rights. A petition for revocation, they argue, implies greater formality than a request, and thus the revocation information was inaccurate and misleading. The parents also contend the release form was inaccurate because section 600A.4(4) permits the parent to request revocation in "the juvenile court designated in section 600A.5," which includes the juvenile court of the county of the mother's residence (here New Hampshire), whereas the release form was captioned "In the Iowa District Court for Linn County, Iowa (Juvenile Division)." They argue this could be confusing, but do not contend that they were in fact misled by it.

The evidence shows that Potter and attorney Ransmeier spent a considerable amount of time explaining to the parents the details of the release form and their right of revocation. They even discussed the 96-hour limitation and advised the parents that, if they desired to revoke the release, it probably should be done by the following Friday, in the event the Iowa court would not deduct weekends from computation of the 96-hour revocation period.

We believe the wording of the release form, which closely matched the revocation provisions of section 600A.4(4), sufficiently informed the natural parents of their rights regarding revocation. Kimberly testified she read the form, including its explanation of the revocation rights, and was given a copy of it. Neither parent claims to have actually been confused or misled by the form itself.

II. *The attempted revocation.*

The natural parents contend they had successfully revoked their release within the 96-hour period provided by section 600A.4(4) by a telephone call from Kimberly to Potter on April 16, the day after the release was signed. Potter testified Kimberly did call him on April 16 but that she did not tell him she wanted to revoke the release, only that the decision she had made was "tearing her up," and that she wanted to obtain counseling. At no time, according to Potter, did she request a return of the child during that telephone conversation.

Kimberly testified she knew after the April 16 telephone conversation that "there hadn't been any revoking." That she did not consider the April 16 conversation to amount to a revocation is also supported by the second call she made to Potter, on April 25, during which she clearly expressed her desire to revoke. (By that time, the 96-hour period had expired, and her right of automatic revocation had passed.)

Other witnesses testified to conversations with Kimberly immediately after the April 16 call indicating there had been no revocation. She told her sister, in the presence of her grandmother, that her decision on adoption had been the right one; and, despite the fact she talked with her grandmother about "casual" matters immediately after the call, she did not mention the adoption proceedings or her purported revocation of the release.

The burden of proving their revocation, by a preponderance of the evidence, is upon Kimberly and Robert. *See Stotler v. Lutheran Social Services of Iowa*, 209 N.W.2d 121, 128 (Iowa 1973). We conclude the evidence did not establish a revocation in the telephone call to Potter.

There is an additional problem in attempting to establish a revocation. Section 600A.4(4) requires that a request for revocation be made to "the juvenile court designated in section 600A.5," and the release form had so advised them: "The parent(s) of the above-named child is/are hereby informed that a parent . . . may petition . . . or may request, at the hearing on termination of parental rights, the *Juvenile Court* to order this Release revoked." (Emphasis added.) The natural parents contend this requirement is satisfied by contacting "someone in control of the proceedings," and that that someone was Potter.

We do not agree; the statute clearly requires the revocation request to be made to the court. The language is clear, and we cannot amend or modify it by construction to mean something else. *See* § 4.1(2), The Code. The parents contend, however, that Potter and attorney Ransmeier had inserted themselves so deeply into the proceedings that "[i]t strains logic beyond the breaking point to require Kimberly to bypass [them] and to search for the Juvenile Division of the Iowa District Court." We do not believe, however, that requirements for filing in juvenile court, or any court, may be satisfied by filing with attorneys simply because they are more accessible. The resulting chaos of such a system is evident.

Whatever Potter's function was in this matter, he was not the juvenile court for purposes of requesting a revocation under section 600A.4(4). The nature of his involvement brings us to the next division.

### III. *Revocation for "good cause."*

If a parent requests revocation within 96 hours, the release must be revoked. § 600A.4(4). Beyond this period the release will be revoked "only upon clear and convincing evidence that good cause exists for revocation." *Id.* The natural parents contend that, even if the telephone call to Potter did not amount to a revocation, good cause exists for a court to revoke anyway. Section 600A.4(4) states "good cause for revocation includes but is not limited to a showing that the release was obtained by fraud, coercion, or misrepresentation of law or fact which was material to its execution." Kimberly and Robert contend the release here was obtained by constructive fraud and coercion.

A. *Constructive fraud.* It is contended that Potter "occupied a position of knowledge, expertise, and access superior to that possessed" by Kimberly and Robert, and misrepresented, or failed to disclose, certain facts while occupying a position of trust. The conclusion is that he was guilty of constructive fraud.

> What is called "constructive fraud" does not necessarily negative integrity of purpose. It has been defined as "an act which the law declares fraudulent without inquiry into its motive." Or "such contracts or acts as, though not originating in any actual evil design or contrivance to perpetrate a fraud, yet by their tendency to deceive or mislead, or to violate confidence, are prohibited by law." It has also been said to be such fraud as "the law infers from the relationship of the parties or the circumstances by which they are surrounded, regardless of any actual dishonesty of purpose."

*Curtis v. Armagast*, 158 Iowa 507, 520, 138 N.W. 873, 878 (1912) (citations omitted). The relationship which allegedly gave rise to the constructive fraud was that of attorney and client. Although Kimberly and Robert both testified Potter was not their attorney, they now contend that he had fulfilled that role in fact. Potter, on the otherhand, denies he acted as their attorney. Kimberly had consulted another attorney concerning the matter of adoption two or three times when the child was approximately a month-and-a-half-old. She did not, according to her testimony, consider either Potter or Ransmeier to be her attorney:

Q. During this meeting, did Mr. Potter indicate to you that—whether he was representing you as a lawyer?

A. No.

Q. He didn't say one way or another?

A. He said that he wasn't our lawyer.

Q. Did he make that real clear to you?

A. Yes.

Q. Did you think he was your lawyer?

A. No.

Q. Were you really sure about that?

A. Yes. I took his word for it.

Q. Why did you think he was not your lawyer?

A. Because he made it very clear to us, and also, that we hadn't hired him. I don't believe money was involved.

\* \* \* \* \* \*

Q. During the meeting did Mr. Ransmeier indicate who he was representing or whether he was representing anyone at all?

A. I believe Fred Potter said that neither one of them were representing us.

Q. So you were—you were satisfied that neither Fred Potter nor John Ransmeier were representing you?

A. Yes.

Similarly, Robert testified:

Q. Did you think that Mr. Potter was your lawyer during this [April 15] meeting?

A. No I did not.

Q. Did you think Mr. Ransmeier was?

A. No.

Q. Why did you—why were you sure that they weren't?

A. Because they told us they weren't our lawyers.

\* \* \* \* \* \*

Q. Is there any other reason why you were sure that they were not your lawyers?

A. Because they kept repeating to us that they weren't, they weren't going to be our lawyers.

The complaint is that Potter's interest in securing an adopted child for his relatives effectively made him a servant to two masters, a fact not revealed to Kimberly and Robert. Although the natural parents do not specify what difference this disclosure would have made, they contend the existence of the conflict was sufficient alone: "The court should not become mired in speculation as to what [the natural parents or grandparents] would have done had they known these facts." We do not believe, however, that even if this conflict were established it can be the basis for revocation of the release without showing it had some effect in bringing it about. The statute requires that allegedly improper acts must have been "material to [the release's] execution." § 600A.4(4).

█ The natural parents have the burden of proving fraud, or other good cause, by "clear and convincing evidence." *Id.* We believe the evidence here falls short of showing an attorney-client relationship, or a position of trust and confidence such as would give substance to a claim of constructive fraud. In retrospect it appears that Potter should not have assumed an active role in securing the release. The testimony on the part of all of the witnesses, including Potter, Ransmeier, and Kimberly's grandparents, however, reveals that the tone of the April 16 meeting was explanatory, not coercive. And, while Potter withheld information about the identity of the prospective adoptive parents, we do not believe that revelation would have had any effect on the parents' decision. Moreover, it would have been inconsistent with Kimberly's stated desire of maintaining anonymity for the adoptive parents.

█ B. *Coercion.* Kimberly and Robert contend the release of their child was coerced, and was thus invalid under section 600A.4(4). In the context of this case, coercion is the equivalent of duress, which is defined as

any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his

volition. It has also been defined as compulsion or restraint by which a person is illegally forced to do, or forbear from doing, some act. Generally speaking, duress may be said to exist whenever one, by the unlawful act of another, is induced to make a contract or to perform some other act under circumstances which deprive him of the exercise of free will. Duress destroys the free assent necessary for entering into a contract and indeed prevents the formation of a binding contract.

25 Am.Jur.2d *Duress and Undue Influence* § 1, at 353 (1966). The "pressure" alleged here came largely from Kimberly's family and from the friends who had been caring for the child. The child had been cared for almost entirely by the child's grandparents and family friends; these people, feeling incapable of continuing to care for him on a full-time basis and realizing he was getting older, encouraged Kimberly to make *some* decision on his future, either to assume the responsibility herself or place him for adoption. These actions did not amount to coercion; the pressure on Kimberly to resolve the dilemma in *some* manner does not amount to coercion in the execution of the release. We think the evidence also fails to show any coercion by Potter or Ransmeier. Both Kimberly and Robert acknowledged that the decision to place the child for adoption was their own; Kimberly testified that neither Potter nor Ransmeier had played any role in it. In fact, once Robert and Kimberly had made the decision on adoption, Potter suggested they wait a while longer before doing anything about it. Revocation of the release is not mandated by these facts.

IV. *Best interests of the child.*

■ Our termination statute provides that except in cases of alleged fraud, coercion, or misrepresentation, "the juvenile court shall give paramount consideration to the best interests of the child and due consideration to the interests of the parents of the child" in determining whether there is good cause for the revocation of a release. § 600A.4(4). In oral argument, counsel for Robert and Kimberly asserted the child's best interests was their strongest argument. We believe it to be their weakest.

Kimberly's grandfather testified he did not think she could "handle" the child's care. Her grandmother similarly expressed concerns about the child's future, particularly in light of the parents' shaky marital and financial condition. Kimberly's father testified that the child would be better off in the home of the intervenors, the proposed adoptive parents. These adoptive parents, according to testimony, were providing an excellent home. In contrast, neither Kimberly nor Robert could be considered to have been a full-time parent at any time, nor did either of them express any real desire to do so. In the eight weeks of the child's life preceding the parent's release of custody he had been cared for almost exclusively by others. Kimberly exhibited very little interest in being a mother and, in her infrequent visits to see him while he was living with the family friends, Kimberly treated him more like a doll than her own child. Robert's participation in these proceedings appeared to be rather passive; his interest in obtaining custody of the child, according to the evidence, was motivated more by a desire to please Kimberly than to reestablish a parent-child relationship. We believe this bears strongly on the decision of the best interests of the child. In some respects, the facts of this case closely resemble those in *In re Adoption of Gibson*, 239 N.W.2d 540 (Iowa 1976). Without belaboring the facts further, we reach the same conclusion as we did in *Gibson*: consideration of the child's best interests clearly dictates that he remain in the home of the intervenors.

We affirm the order of termination.

AFFIRMED.