**IN THE COURT OF APPEALS OF IOWA**

No. 18-0545
Filed March 6, 2019

**IN THE INTEREST OF Z.M.,**
**Minor Child,**

**S.M., Custodian,**
        Petitioner-Appellee,
**vs.**

**C.M.-G., Mother,**
        Respondent-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Paul D. Scott, Judge.


The biological mother appeals the juvenile court's termination of her parental rights in a private termination action. **AFFIRMED.**


Chira L. Corwin of Corwin Law Firm, Des Moines, for appellant mother.

Shayla L. McCormally of McCormally & Cosgrove, P.L.L.C., Des Moines, for appellee custodian.

Lori Bullock of Newkirk Zwagerman, P.L.C., Des Moines, guardian ad litem for minor child.


Heard by Potterfield, P.J., and Tabor and McDonald, JJ.

**POTTERFIELD, Presiding Judge.**

C.M.-G., appeals the juvenile court's termination of her parental rights to her biological child, Z.M., in a private termination action. The juvenile court terminated C.M.-G.'s parental rights pursuant to Iowa Code section 600A.8(1) (2017), which allows the court to terminate when the parent signed a release of custody and the release has not been revoked.[1] C.M.-G maintains she revoked her release of custody within the ninety-six hours contemplated by the statute. *See* Iowa Code § 600A.4(4) ("[A] parent who has signed a release of custody . . . may, at any time prior to the entry of an order terminating parental rights, request the juvenile court . . . to order the revocation of any release of custody previously executed by either parent. If such request is by a signing parent, and is within ninety-six hours of the time such parent signed a release of custody, the juvenile court shall order the release revoked."). Alternatively, she maintains the juvenile court should have allowed her to revoke the release after the ninety-six hours elapsed because she established good cause for the revocation. She contends she demonstrated good cause because (1) the release was obtained by fraud, coercion, or misrepresentation of law or fact and (2) she did not understand the release at the time she signed it.[2] Finally, C.M.-G argues the court should not have

---

[1] The child's legal father signed a release of custody. He did not revoke the release or contest the termination, and he does not appeal the juvenile court's ruling terminating his parental rights. The biological father of the child was never identified, despite diligent inquiry. His rights were also terminated, and he does not appeal.

[2] C.M.-G also argues the court should not have terminated her parental rights because she did not abandon her child. We acknowledge the juvenile court did not specifically state it terminated C.M.-G.'s parental rights pursuant to section 600A.8(1) (release of custody) rather than 600A.8(3) (abandonment), but the custodian never alleged the mother abandoned the child and the court did not make the necessary findings to terminate for reasons of abandonment. *See* Iowa Code § 600A.8(3)(b)(1)–(3) (considering to terminate based upon whether the parent has maintained substantial and

granted the petition to terminate her parental rights because it is not in Z.M.'s best interests.

**I. Background Facts and Proceedings.**

C.M.-G is the biological mother of Z.M. She is also the biological mother of three other children, who remain in her care. When C.M.-G. first learned she was pregnant with Z.M.—in the fall of 2016—C.M.-G reached out to D.M. and his wife, E.M., indicating she would need help with the child after the birth. D.M. is C.M.-G's adoptive brother, but the two characterize their relationship as one more typical of an uncle and a niece due to the difference in their ages.

According to D.M., at the time C.M.-G. first indicated she would need help after the baby was born, he indicated a willingness to help her like he does with her other three children—often caring for them on weekends or helping to provide for their financial needs. Otherwise, D.M. made it clear to C.M.-G. that he and E.M. were not interested in caring for the child in their home for an extended period of time unless they were allowed to adopt the child.

D.M. and C.M.-G did not speak of adoption again until after C.M.-G. gave birth in June 2017. C.M.-G. called D.M. and E.M. from the hospital and again asked for their help. Then, after she and Z.M. were discharged, she called D.M. and asked him to pick up Z.M. to take the child to his home. D.M. and E.M. took the child, and they have continued to care for her since that time.

---

continuous or repeated contact with the child as evidenced by contributing to the child financially, having regular communication or contact with the child or person caring for the child, or living with the child). As we understand the ruling, the court terminated the C.M.-G.'s rights based on what it determined was a valid release of custody that was not properly revoked within the first ninety-six hours and for which there was not good cause to revoke thereafter. *See id.* §§ 600A.4(4), .8(1). Thus, we do not consider her argument pursuant to section 600A.8(3) further.

On July 18, E.M., D.M., C.M.-G, and C.M.-G.'s husband went to the law office of Shayla McCormally—E.M. and D.M.'s lawyer—in order for C.M.-G. and C.M.-G's husband to sign releases of custody. C.M.-G was told that McCormally was not her attorney. The four were at the office approximately two hours before C.M.-G. signed the release of custody. The release provides in part, in bold and capital letters:

> I have been informed that as a person signing the release of custody I may petition the juvenile court in Polk County, Iowa within 96 hours after signing this release of custody, in which case the juvenile court must order this release revoked. I have also been informed that after 96 hours the juvenile court may order the release revoked only upon clear and convincing evidence that good cause exists for such revocation. I have been informed that good cause for revocation includes but is not limited to a showing that this release of custody was obtained by fraud, coercion or misrepresentation of law or fact which was material to its execution.

C.M.-G. called McCormally a number of times on the day before the ninety-six-hour window expired. At least once, she told McCormally she did not want to go through with the release of custody and ultimately the adoption. However, either later in the same call or in another call to the attorney, C.M.-G reported that she had changed her mind again and wanted to leave the release intact. In response to her calls, McCormally reminded C.M.-G. she was not her attorney, advised her to contact an attorney, and told her that if she wanted to revoke the release of custody, she needed to contact the juvenile court in writing before the ninety-six hours expired. As a result of McCormally's advice, C.M.-G. reached out and spoke to an attorney at Iowa Legal Aid that same day.

C.M.-G. did not file a revocation of her release or otherwise contact the juvenile court during the ninety-six-hour window.

On August 18, McCormally filed a petition to terminate the parental rights of C.M.-G to Z.M. The termination petition was originally set for an uncontested hearing on November 1, 2017. However, at that hearing, C.M.-G. asked for an attorney to be appointed to assist her with contesting the petition. An attorney was appointed, and the hearing was rescheduled.

At a contested hearing on February 14 and 15, the court took up the issues of whether C.M.-G. had properly requested a revocation of the release of custody within the first ninety-six hours after signing it, whether there was otherwise good cause for the court to allow the revocation of the release, and whether the termination petition should ultimately be granted.

At the hearing, C.M.-G. testified she has learning disabilities related to reading comprehension and that she was taking prescribed hydrocodone at the time she signed the release of custody; she maintained both affected her ability to understand the release at the time she signed it. Additionally, she testified she is afraid of D.M. and felt forced both to sign the release and then to not revoke the release during the allotted ninety-six hours.

The juvenile court filed a written ruling on March 5, 2018. The court determined C.M.-G did not revoke her release of custody during the first ninety-six hours. Additionally, because C.M.-G. had "the mental capacity to understand the release of custody and what steps she needed to take in order to revoke that release" and "[t]here was no evidence of coercion in this case," the court concluded there was not good cause to revoke C.M.-G's release of custody. Based on those conclusions and a determination it is in Z.M.'s best interests, the court terminated C.M.-G.'s parental rights to Z.M. pursuant to section 600A.8(1).

C.M.-G. appeals.

## II. Standard of Review.

We review termination proceedings under chapter 600A de novo. *In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010). "We accord weight to the factual findings of the juvenile court, especially those regarding witness credibility, but we are not bound by them." *Id.* As always, in cases involving the termination of parental rights the paramount concern is the best interests of the child. *See* Iowa Code § 600A.1.

## III. Discussion.

### A. Revocation.

**1. Initial Ninety-Six Hours.** C.M.-G challenges the juvenile court's conclusion she did not revoke her release of custody during the first ninety-six hours after she signed it. She argues, in direct contravention of case law, that her phone call to McCormally expressing her desire to revoke the release was sufficient to effectuate the revocation. C.M.-G has the burden of proving her revocation by a preponderance of the evidence. *See In re C.K.*, 315 N.W.2d 37, 42 (Iowa 1982).

In *C.K.*, the biological parents argued they had properly revoked their release of custody because they called an attorney who was involved in the matter and indicated their desire to do so. 315 N.W.2d at 39–40. Our supreme court disagreed, stating:

> [T]he statute clearly requires the revocation request to be made to the court. The language is clear, and we cannot amend or modify it by construction to mean something else. . . . We do not believe . . . that requirements for filing in juvenile court, or any court, may be

satisfied by filing with attorneys simply because they are more accessible. The resulting chaos of such a system is evident.

*Id.* at 42.

Additionally, C.M.-G argues the messages that she and D.M exchanged during the statutorily prescribed ninety-six-hour window establish there were times during the allotted trimeframe when she wished to revoke her consent. But revocation is not a question of intent; it requires specific action by the signing parent. *See* Iowa Code § 600A.4(4). And, as stated above, expressing the decision to revoke consent to anyone other than the juvenile court is not sufficient.

**2. Good Cause for Revocation.** Alternatively, C.M.-G. argues the court should have allowed her to revoke her release of custody once she expressed the desire in November 2017 because there was good cause for the revocation. *See id.* ("[T]he juvenile court shall order the release [of custody] revoked only upon clear and convincing evidence that good cause exists for revocation. Good cause for revocation includes but is not limited to a showing that the release was obtained by fraud, coercion, or misrepresentation of law or fact which was material to its execution.").

In a heading in her appellate brief, C.M.-G argues her release of custody was obtained by fraud, coercion, or a misrepresentation of law or fact. But much of the section is devoted to describing medical issues C.M.-G claims to have faced at Z.M.'s birth that she believes impacted her ability to make an informed decision regarding the release. She cites no authority and makes no explicit argument tying the medical issues to the legal issues of fraud, coercion, or misrepresentation of fact or law. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support

of an issue may be deemed waiver of that issue."). Moreover, C.M.-G did not sign the release of custody until six weeks after she gave birth to Z.M. We do not consider this further.

Similarly, C.M.-G cites no legal authority to support her argument that D.M. and E.M.'s offer to adopt Z.M. but not otherwise care for her constitutes coercion. We acknowledge C.M.-G.'s feelings of helplessness when she realized she did not have the resources or ability to care for a new baby along with her three other young children and her adoptive brother expressed his unwillingness to become just a temporary caregiver for Z.M. But D.M. and E.M. had no obligation to help care for Z.M. Their refusal to assume care for the child on terms other than their own is not coercion.[3] *See C.K.*, 315 N.W.2d at 43–44 ("[C]oercion is the equivalent of duress, which is defined as any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition." (citation omitted)). As the district court stated, E.M. and D.M. "have provided love and support, and they have been very clear about their boundaries and their involvement."

Next, C.M.-G argues there is good cause to revoke her release of custody because she did not understand the release at the time she signed it. She

---

[3] Moreover, we understand their reticence to do as C.M.-G. proposed—care for Z.M. for the first couple years of her life and then transition her back into C.M.-G.'s home. As former providers of foster care, E.M. and D.M. recognized the hardship involved with caring for Z.M. for a number of years and then having their relationship disrupted. As E.M. testified:

> We had done foster care and—before and we had said that that was not fair to the child, that that was not going to be—it was not fair to the child for her to leave the child in our care as a newborn for an undetermined amount of time and then to immediately come back in whenever she felt free to just come back and take the child. So if she truly needed our help and she wanted us to raise the child, we would be there to help her.

maintains her learning disabilities and her use of a prescribed medication prevented her from comprehending the legal import of the release of custody. The district court did not find credible C.M.-G.'s testimony that she did not understand the release or what she was required to do to revoke the release, and we do not either. While C.M.-G. testified she was rushed through signing the document, E.M., D.M., and a coworker of McCormally's who was a witness to the signing of the release, testified C.M.-G. spent approximately two hours at the lawyer's office before she signed. No one noticed any effect of medication on C.M.-G., and each person testified the release was explained to C.M.-G at length. McCormally verbally read the entire release to C.M.-G., answered questions C.M.-G. had, and asked C.M.-G to rephrase parts of the release back to her to check whether she understood. Additionally, E.M. testified C.M.-G. asked about the ninety-six-hour window, and McCormally told her the exact day and time by which she would have to file a revocation. The fact C.M.-G. has learning disabilities, without more, is not good cause to revoke the release of custody. *See In re C.M.L.*, No. 06-0006, 2006 WL 1896983, at *2 (Iowa Ct. App. July 12, 2006) ("[The biological parent] asks this court to include a parent's low-functioning mental capacity in the list of instances of good cause for revocation of a release of custody. We decline to do so.").

It is apparent that in the months after signing the release, C.M.-G came to question her decision. In her testimony, she acknowledged she was unable to care for Z.M. at the time she signed the release in July but testified she was in a better place to do so at the time of the termination trial in February. Regret and changed circumstances do not meet the legal standard for good cause for revocation. *See In re Adoption of Gibson*, 239 N.W.2d 540, 543 (Iowa 1976)

(denying biological mother's request to revoke consent to adoption even though she was "now better off and better able to provide the care and affection which [the child] needs" because "her change of heart and the change of circumstances to which she testified [were not] sufficient good cause for the revocation of her earlier consent").

We agree with the juvenile court that C.M.-G. has not established good cause for revocation of her release of custody.

**B. Best Interests.**

C.M.-G. maintains that termination of her parental rights is not in Z.M.'s best interests. C.M.-G argues that because she is Z.M.'s biological mother, it is in Z.M.'s best interests to be raised by her. We are statutorily required to complete a more structured best-interests consideration. *See* Iowa Code § 600A.1(2).

Pursuant to section 600A.1(2), "[t]he best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent." In determining whether C.M.-G has assumed the duties of a parent, we focus on "the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life." *Id.* Here, we agree with the juvenile court's best-interests analysis, in which it stated:

> The evidence showed that despite her claims of wanting to parent, [C.M.-G.] has not tried to be an active parent nor provide[d] any support since [Z.M.'s] birth. She has not provided any financial assistance or any material goods for [the child]. Additionally, she has visited [Z.M.] on very few occasions, all of which have been at [E.M.'s] urging.

Termination of C.M.-G's parental rights to Z.M. is in the child's best interests.

**IV. Conclusion.**

C.M.-G has not met her burden to prove she revoked her release of custody within the statutorily-prescribed window or that there was good cause to do so afterward. Because her release of custody is not revoked and it is in the best interests of Z.M., we affirm the termination of C.M.-G's parental rights to the child.

**AFFIRMED.**