# IN THE COURT OF APPEALS OF IOWA

No. 24-1629
Filed October 1, 2025

**IN THE INTEREST OF R.A.,**
**Minor Child,**

**BETHANY CHRISTIAN SERVICES,**
    Petitioner-Appellee,

**N.A., Mother,**
    Respondent-Appellant,

**J.A., Father,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Sioux County, Jessica R. Noll, Judge.

A mother and father separately appeal the termination of their parental rights to a child. **AFFIRMED ON BOTH APPEALS.**

Cathleen J. Siebrecht (argued) of Siebrecht Law Firm, Pleasant Hill, for appellant mother.

Leah Patton (argued) of Patton Legal Services, LLC, Ames, for appellant father.

Jenny L. Cleveringa (argued) of Klass Law Firm, L.L.P., Sioux Center, for appellee intervenors.

Jared R. Weber (argued), Orange City, for appellee Bethany Christian Services.

Debra S. De Jong, Orange City, attorney and guardian ad litem for minor child.

Heard at oral argument by Tabor, C.J., and Greer and Buller, JJ.

**BULLER, Judge.**

The mother of a child (R.A., born 2023) appeals the private termination of her parental rights. The father separately appeals. On our de novo review, we affirm both appeals.

## I.      Background Facts and Proceedings

In 2014, the mother engaged with Bethany Christian Services (BCS) for the adoptive placement of another child and received $7123.80 in living expenses. After that child was born, the mother signed a release of custody but revoked within the statutory ninety-six-hour window and retained custody of that child. *See* Iowa Code § 600A.4(4) (2014).

Starting around 2022, the mother and father started what became a turbulent relationship. In April 2023, they learned the mother was pregnant. Through the pregnancy, the father provided only about $100 in financial support to the mother and attended two prenatal appointments.

The mother began planning an adoption around August. Over the next two months, she coordinated with BCS about the specifics. The mother and BCS did not discuss the mother's previous adoption attempt, and BCS did not make any specific promises as to financial support.

BCS works with both birth and adoptive parents. If assigned case workers are indisposed on a particular date, other staff step in to assist. Because the mother's primary case worker was on vacation when she gave birth prematurely in November, an alternate case worker assisted the mother. A BCS executive director finalized the adoption paperwork.

The child tested positive for methamphetamine at birth and was critically ill, and he was transported to the neonatal intensive care unit (NICU) in Cedar Rapids. The mother admitted to hospital staff and a BCS case worker that she used methamphetamine while pregnant.

For a portion of her time in the hospital, the mother was on a morphine drip. After the morphine was disconnected, the mother was only taking ibuprofen. By her recollection, she had been off the morphine at least six hours before her meeting with the BCS executive director to complete the paperwork four days after giving birth. Medical records suggested she may have been off morphine longer than six hours.

The executive director provided the mother with the release of custody paperwork, and the mother's completion of the documents was witnessed by her nurse and a notary public. The mother disputes whether the director explained the paperwork or offered post-birth counseling. And she testified she didn't read the paper before signing the release, though her nurse and the BCS director both testified each paragraph was discussed during the signing process. The director did not offer—nor did the mother request—legal counsel. And she did not ask any questions or for clarification. The mother initialed each paragraph of the release form, including two contradictory paragraphs indicating that she both waived and received counseling. The signature page did not have a date and time for the mother's signature, but both witnesses and the notary included the date with theirs.

Over the following month, the mother became frustrated with what she perceived as BCS's lack of financial support. For this birth, BCS provided $436.23 in assistance to the mother. A BCS employee testified the agency averages $500

in assistance per birth and statutorily cannot provide more than $2000 in living expenses. *See* Iowa Code § 600A.6C(2)(a)(5) (2023).

The father lives with the paternal grandfather. The mother informed the father of her adoption plan in August over text message. He did not object to her plan at the time or articulate a desire to retain custody.[1] And he declined an offer from the mother to join a Zoom conference with BCS. Afterward, the mother did not want the father involved in the adoption; she declined to provide BCS with his name or contact information until November 9. And after disclosing his information, the mother failed to provide the correct phone number.

The mother informed the father of the child's birth after four days. The father has never met the child. At trial, he explained he declined to visit the child because he did not trust BCS. He first testified that he didn't know the mother used methamphetamine during her pregnancy, then he claimed the child's drug exposure was not serious because it was "very small amounts."

The father never inquired about the child's health and present condition to anyone beside the mother. At trial, the father believed the child had no medical needs. In February 2024, the father only had a bare room and a car seat prepared for the child. By April, he had obtained a crib but still had no established plan for childcare during his work hours. And he expressed he wanted to use the mother "for care or advice" if he had custody of the child, regardless of her legal status.

---

[1] The father maintained he told the mother to put the child up for adoption "because he was upset." In text messages admitted into evidence surrounding this exchange, they—to put it mildly—traded insults and called each other names.

At least one of the adoptive parents was always at the NICU until the child's discharge—November 15 through 29. The adoptive parents actively provided for the child's living and medical expenses. They have taken the child to every wellness and specialty appointment and started proactive services to aid the child's development.

BCS petitioned to establish custody of the child and terminate the mother's and father's parental rights under chapter 600A. The father and mother each resisted the termination. A guardian ad litem (GAL) was appointed: she reviewed the file, communicated with the biological parents, the adoptive parents, BCS, and the parties' attorneys before submitting a report. The adoptive parents intervened in the case after BCS transferred physical care of the child to them. After a contested trial, the juvenile court terminated both parents' rights under section 600A.8. The parents separately appeal. But before addressing the merits, we turn to a procedural issue.

## II. The Mother's Reply Brief and Counsel's Use of Cases "Hallucinated" by an Artificial Intelligence Program

Issues with artificial intelligence (AI) have reached most areas of American life, and our courtroom is no exception. In August of this year, this court "stress[ed] that self-represented litigants and attorneys alike have a duty to independently verify the authenticity and veracity of all sources and assertions when relying on artificial intelligence tools to prepare trial or appellate court filings." *Luke v. Dep't of Health & Hum. Servs.*, No. 24-1421, 2025 WL 2237311, at *1 (Iowa Ct. App. Aug. 6, 2025). And in this case, we are confronted with an attorney who did not fulfill that duty to verify AI-generated work product.

One of the perils of using AI is that it may provide fabricated or false information, sometimes termed "hallucinations." A recent law journal article explains it well:

> AI hallucinations occur when the tool generates false or misleading information. This happens because AI predicts responses based on data patterns—not on verified facts or real-time knowledge. Hence, "artificial" intelligence. As a result, AI may miss context, make erroneous assumptions, perpetuate bias, or overgeneralize. For example, when asked for legal citations that support an argument, AI might fill in the gaps with plausible but fake law. Trusting this unverified output can lead to severe consequences.

Robert K. Jenner & Justin Browne, *The Promise and Pitfalls of AI*, 61 JTLA Trial 30, 34 (June 2025) (footnote omitted). But the problem is not just limited to legal writing; as a *New York Times* headline and subhead recently put it: "A.I. Is Getting More Powerful, but Its Hallucinations Are Getting Worse: A new wave of 'reasoning' systems from companies like OpenAI is producing incorrect information more often. Even the companies don't know why." Cade Metz & Karen Weiss, *A.I. Is Getting More Powerful, but Its Hallucinations Are Getting Worse,* N.Y. Times (May 5, 2025), https://perma.cc/WX8R-WNTT.

Particular to this case, our court discovered while preparing for oral argument that the mother's reply brief appeared to include citations to cases and statutory text that do not exist and described other authorities so erroneously that no reasonable attorney could have made the error. After we diligently searched and could not find these authorities, and suspecting that the brief contained AI-generated content, we ordered the mother's counsel to provide us with copies of the legal authorities she purported to rely on or file a written explanation of her

conduct and personally appear at oral argument to address whether her conduct warranted a sanction.

At oral argument, counsel informed the court she believed a monetary sanction was warranted, and she apologized for the burden she had imposed on the court. In response to our order, counsel for the mother acknowledged the following material facts in her written response:

- Her reply brief contained "citations to cases and statutes that do not exist, or are not accurately quoted."

- She did not know the citations were hallucinated or the quotes from real authorities were inaccurate "until the court identified them as such" in our order demanding an explanation.

- Due to login issues her with her Westlaw subscription, she "relied on her prior research notes along with secondary AI-driven research tools," and this AI program was the source of the fabricated or hallucinated citations and inaccurate quotations.

- She admits these citations "should have been verified . . . but were not," and she "accepts full responsibility for not catching these false citations and assertions before presenting them to the Court for consideration."

- She indicates she "now understands" the perils of using AI tools in this manner, and she acknowledges the burden she has imposed on the court and opposing counsel—as well as the "damage to her own credibility and reputation."

- As a remedial measure, she now plans to not file any documents "without full access to verified research databases or conducting a rigorous line-by-line cite-check of all memoranda, motions, and briefs against official sources" and to request additional time for filing if needed "to guarantee accuracy of citations."

We appreciate the candor of counsel's explanation of her conduct, though we recognize it came only after we ordered she provide that explanation. It is not clear to us the issue would have been discovered absent court intervention. We are also sympathetic to issues with technology, such as login issues. And we are

aware that, even in 2025, not all lawyers are familiar with the perils of using AI tools. Regardless of her lack of ill intent, counsel has also correctly identified that her conduct imposed a significant burden on this court. Our mandate is to justly dispose of a high volume of cases, *see* Iowa Ct. R. 21.11, and we have instead devoted resources to this side quest that could have been deployed rendering decisions on the merits.

We believe a court-levied sanction is appropriate under the circumstances after considering the aggravating and mitigating factors set forth above and in more detail in counsel's explanatory filing. In considering what if any sanction to impose, we have surveyed how other jurisdictions have dealt with the issue.[2] We have also reviewed a database of cases (including hyperlinked opinions) in which courts across the globe have addressed "hallucinated" content generated by AI—more than 355 cases as of oral argument in this case on September 9, 2025.[3] We accept counsel's assertions at face value, and we credit her statement at oral argument that she was "humbled and haunted" by her conduct and our discovery of the same. As a result, we believe the sanctions we impose fall very much toward the bottom of the spectrum that could be justified on other facts and have been levied by other courts.

---

[2] *See, e.g., Graham-Jackson v. Martin*, No. 2024AP2274, 2025 WL 2250509, at *1 (Wis. Ct. App. Aug. 7, 2025) (per curiam); *In re S.M.*, No. 4-25-0277, 2025 WL 2301801, at *6–7 (Ill. App. Ct. Aug. 7, 2025); *Stephen McCarthy, P.A. v. U.S. Drug Enf't Admin.*, No. 24-2704, 2025 WL 2028399, at *3 & n.5 (3d Cir. July 21, 2025).

[3] *See* Damien Charlotin, *AI Hallucination Cases*, Damien Charlotin: Data (Sept. 9, 2025), https://perma.cc/F9LX-JJBY.

In our exercise of discretion,[4] we order three sanctions:

(1) we strike the mother's reply brief;

(2) we impose a monetary penalty of $150, payable to the clerk of appellate courts and due within 60 days; and

(3) we direct the clerk of appellate courts to transmit a copy of this opinion and counsel's written explanation to the Attorney Discipline Board (ADB) when this opinion is filed.[5]

Based on the factors we've set forth in this opinion and the somewhat novel nature of the sanctionable conduct, we provide that counsel for the mother may elect to attend two hours of legal ethics training particular to AI within sixty days in lieu of the $150 penalty. If she elects to attend the training rather than pay the penalty, she must certify her attendance in writing by filing a certification under oath or affirmation in this case number.

As a final note on this matter, we observe that we have not held counsel's conduct against the mother in this case. We consider the full merits of the mother's arguments in this appeal.[6]

## III. Standard of Review

We review private termination proceedings de novo. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). "Although we are not bound by them, we give

---

[4] We find this discretion flows from our inherent power and the rules of court, including but not limited to Iowa Rule of Civil Procedure 1.413.

[5] ADB is an independent entity, and we note it may conduct its own investigation and recommend its own disciplinary sanction entirely separate from what we impose in this opinion. We express no opinion on how the ADB should proceed. But we are obligated to report misconduct, so we do. *See* Iowa R. of Prof'l Conduct 32:8.3 (on the duty to report misconduct); Iowa Code of Judicial Conduct 51:2.15(B) (same).

[6] We express no opinion on whether different facts in a future case may justify different, greater sanctions.

weight to the trial court's findings of fact, especially when considering credibility of witnesses." *Id.* (citation omitted). When interpreting chapter 600A, the children's best interests "shall be the paramount consideration," but the parents' interests "shall be given due consideration." Iowa Code § 600A.1(1).

## IV.  The Mother's Appeal

The mother raises two main issues: whether the release of custody she signed was valid and whether there was good cause to revoke the release beyond the statutory ninety-six-hour window. We consider each. And because we find the release-of-custody and good-cause issues dispositive, we do not reach the mother's tertiary best-interests claim.

## A.  Validity of the Release of Custody

The mother first argues the release of custody she signed was statutorily invalid because BCS did not confirm that she dated the signature page and she was not offered and did not expressly waive her right to three hours of post-birth counseling.

Under Iowa Code section 600A.8(1), a ground for termination of parental rights includes when "[a] parent has signed a release of custody [under] section 600A.4" and has not revoked that release. A valid release of custody has explicit statutory requirements. *See Id.* § 600A.4. The requirements at issue are:

> A release of custody:
> . . . .
> Shall contain written acknowledgment of the biological parents that after the birth of the child three hours of counseling regarding the decision to release custody and the alternatives available have been offered to the biological parents by the [Iowa Department of Health and Human Services (HHS)] or an adoption service provider. The release of custody shall also contain written

> acknowledgment of the acceptance or refusal of the counseling by the biological parent.
>
> . . . .
>
> Shall be signed, not less than seventy-two hours after the birth of the child to be released, by all living parents. The seventy-two-hour minimum time period requirement shall not be waived.

*Id.* § 600A.4(2)(d)(1), (h).

The extent of the mother's claim on this point is that she didn't date her signature. She does not claim her signature was forged or that BCS violated the seventy-two-hour moratorium immediately following birth. Instead, she blames BCS for the lack of date. Even assuming without deciding a date for the signature was required (aside from ensuring the three-day waiting period), both a neutral witness and a notary public signed and dated the signature page, verifying the mother signed the release after the statutorily-required interval. We affirm the juvenile court's rejection of this claim.

The mother also argues the release of custody was invalid because BCS did not offer her post-birth counseling, and she urges that the contradictory checkboxes on the form support this. Specifically, she asserts "the record is devoid of any evidence" that she was offered post-birth counseling. But the juvenile court found, and we agree, that there was credible evidence the mother was offered post-birth counseling. The executive director testified that she offered post-birth counseling to the mother, and the mother declined. The director also testified that she spent about an hour discussing the release with the mother. The mother's nurse—who witnessed execution of the release—corroborated that every paragraph of the release was discussed. We affirm the juvenile court's rejection of this claim as well.

**B. Revocation for "Good Cause"**

The mother next argues that if the release of custody is valid, there is good cause to revoke it based on her allegations that (1) she was still impaired by morphine when she signed; (2) BCS suggested that, if termination failed, it would deliver the child to HHS; (3) she was led to believe she would receive significant financial support from BCS; (4) BCS had a conflict of interest in representing both the mother and the adoptive parents; and (5) BCS did not suggest she seek legal counsel.

A parent who signs a release of custody has an absolute right to revoke the release within ninety-six hours. *Id.* § 600A.4(4). After ninety-six hours, the juvenile court will only revoke the release if a parent shows "clear and convincing evidence" of "good cause." *Id.* "Good cause" includes, but is not limited to, "fraud, coercion, or material misrepresentation of law or fact material to [the release's] execution." *Id.* In cases determining good cause for revocation, coercion is the same as duress and defined as "any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition." *In re C.K.*, 315 N.W.2d 37, 43–44 (Iowa 1982) (cleaned up).

As to impairment, while the mother testified that she felt impaired by morphine, she admitted the drip was disconnected at least six hours before meeting with the executive director and signing the release. And the medical evidence indicated the drip was discontinued at least a day before, such that the mother was only taking ibuprofen when she executed the release. The mother has not proven impairment by clear and convincing evidence.

As for her claim BCS promised to deliver the child to HHS if termination failed, no corresponding communication was admitted into evidence supporting this allegation. The mother did not meet her burden on this claim either.

Regarding fraudulent inducement, the mother argues BCS induced her with promises of significant financial assistance. She points to her previous interaction with BCS in 2014, when she received $7123.80 in financial support—the vast majority of which was housing and utility expenses. But there is no evidence BCS promised the same or similar support, and the juvenile court credited a BCS employee's testimony that it generally provides around $500 in total assistance and statutorily cannot provide more than $2000 in living expenses. *See* Iowa Code § 600A.6C(2)(a)(5). Also, the mother admitted the agency did not make any specific representations as to financial support. We agree with the juvenile court that BCS did not fraudulently induce the mother's assent.

Next, as to the alleged conflict of interest, the mother claims that BCS representing her and the adoptive parents was improper. The mother's substitute case worker had a preexisting year-long working relationship with the adoptive family. But an agency employee testified that, while BCS generally separates case workers between mothers and adoptive families, case workers are cross-trained to step in when necessary. The mother cites no legal authority supporting her claim that adoption workers serving both adoptive and birth parents is a basis for revocation, and we are aware of none. We affirm the juvenile court's rejection of this argument.

Last, the mother seeks to revoke because BCS did not suggest she seek legal counsel. We acknowledge Iowa Code section 600A.4(4)'s "other good

cause" for revocation is not strictly cabined to fraud, coercion, or material misrepresentation of law or fact. *See In re K.L.S.*, No. 02-1333, 2003 WL 1786229, at *2 (Iowa Ct. App. Apr. 4, 2003). But the mother cites no case law suggesting the lack of legal counsel amounts to good cause, and the text of the statute certainly doesn't require counsel. We agree with the juvenile court that the absence of legal counsel here is not "good cause," particularly since the mother did not ask any questions while signing the paperwork and did not request either more time or the assistance of counsel.

## V. The Father's Appeal

The father raises three issues on appeal: whether a GAL report is admissible under Iowa Code chapter 600A; whether the father abandoned the child; and whether termination is in the best interests of the child.

### A. The GAL Report

The father first argues the juvenile court erred by admitting and relying on a GAL report in a 600A termination. The responsibilities of a GAL are not discussed with the same specificity in chapter 600A as they are in chapter 232. *Contrast* Iowa Code § 600A.6(2)(b), *with id.* § 232.2(25)(b).[7] However, our appellate courts have given weight to GAL reports in private terminations, at least so long as they are well-informed and balanced. *See, e.g., In re E.J.R.*, 400

---

[7] We observe that, although not cited by the parties, the Iowa Court Rules include a chapter devoted to "Iowa Standards of Practice for Lawyers Representing Children in Custody Cases," and these aspirational standards apply at least in part to Chapter 600A cases. *See* Iowa Ct. R. ch. 62. These standards outline duties that apply when an attorney serves as a child's attorney or GAL, but no one raised the application of these standards here. Iowa Ct. R. 62:III (Duties of All Lawyers for Children).

N.W.2d 531, 532 (Iowa 1987) ("Conceptually, the standards and rules applicable to terminations under one chapter should not differ from the provisions leading to the identical result in another chapter."); *In re L.M.*, No. 15-1473, 2016 WL 902661, at *2 (Iowa Ct. App. Mar. 9, 2016) (discounting a GAL report where information was only received from one party); *In re J.E.*, No. 15-0187, 2016 WL 2753774, at *7 (Iowa Ct. App. May 11, 2016) (considering the weight to give the GAL report).

Here, the GAL met with and interviewed both parents in their homes. And she provided a thorough analysis of the facts and circumstances around both parents in a neutral manner. We discern no error in admitting the report, nor any prejudice to the father. At best, his arguments go toward weight not admissibility, and he is owed no relief.

### B. Statutory Grounds

Second, the father challenges whether he rebutted that he "abandoned" the child within the meaning of chapter 600A. When a child is six months or younger at the time of termination, the three requirements to rebut abandonment are whether the putative father: (1) "demonstrate[d] a willingness to assume custody of the child rather than merely objecting to the termination" of his parental rights, (2) took "prompt action to establish a parental relationship with the child," and (3) "demonstrate[d], through actions, a commitment to the child." Iowa Code § 600A.8(3)(a)(1). Since lacking any one of these requirements is sufficient, we focus on the third. The legislature has provided additional factors for us to consider when applying these requirements:

> (a) The fitness and ability of the parent in personally assuming custody of the child, including a personal and financial commitment which is timely demonstrated.

(b) Whether efforts made by the parent in personally assuming custody of the child are substantial enough to evince a settled purpose to personally assume all parental duties.

(c) With regard to a putative father, whether the putative father publicly acknowledged paternity or held himself out to be the father of the child during the six continuing months immediately prior to the termination proceeding.

(d) With regard to a putative father, whether the putative father paid a fair and reasonable sum, in accordance with the putative father's means, for medical, hospital, and nursing expenses incurred in connection with the mother's pregnancy or with the birth of the child, or whether the putative father demonstrated emotional support as evidenced by the putative father's conduct toward the mother.

(e) Any measures taken by the parent to establish legal responsibility for the child.

(f) Any other factors evincing a commitment to the child.

*Id.* § 600A.8(3)(a)(2).

The father provided little assistance and demonstrated little interest in the mother's pregnancy. He never visited the child in the birth hospital or during the child's two-week NICU stay in Cedar Rapids. And even as of trial, the father had not met the child and declined the opportunity to do so because he was angry at BCS.

Beyond his lack of physical presence, the record demonstrates the father has not seriously considered the logistics of parenthood. He testified he never contacted BCS, the adoptive parents, or any medical providers about the child's present condition and was unaware of the child's special medical needs. At trial he still lacked a childcare plan. He didn't concretely discuss childcare with his extended family, even though his plan to care for the child as a single parent depended on extended-family assistance. To some extent, he suggested the mother could also provide childcare, even if her rights were terminated. He also had only partly prepared his home for the baby, lacking many daily-use items like

bottles and diapers. And the father also claimed not to know about—and then downplayed—the mother's use of methamphetamine during the pregnancy and its impact on the child's health. The father's actions have not demonstrated a commitment to parenting.

Last, the father argues we should not find abandonment because he contends the mother willfully obfuscated her adoption plan and BCS did not promptly contact him. We are not convinced. We have distinguished "between declining to encourage and outright blocking actions that could show a commitment to the child." *See, e.g.*, *In re O.W.*, No. 24-0862, 2025 WL 52452, at *10–12 (Iowa Ct. App. Jan. 9, 2025). And even if a parent is "prevented . . . from taking prompt action to establish a parental relationship," they must demonstrate the willingness to assume custody and a demonstrate through actions a commitment to the child. *See id.* This is where the father's actions failed.

While it is true the mother did not disclose the father's contact information until six days prior to the child's birth, the father's actions pre- and post-birth confirm his unwillingness to be a parent. The father only attended a few prenatal appointments and did not support the mother through the pregnancy. He did not voice a desire to retain custody until at least mid-October, and he refused to participate in the mother's pre-birth meeting with BCS where he could have communicated his wish for custody. Even his expressed desire to take the baby was only in scattered text messages weeks apart from one another with no other action taken or suggested. He never met the child or visited him in the hospital, despite several opportunities to do so. Nor did he offer financial or physical support for the child. Two months after he first contested termination to the juvenile court,

the only preparation the father had made for the child was an empty room and a car seat. We agree with the juvenile court that the father's actions before and after the child's birth make clear that he abandoned the child.

### C. Best Interests

The father also asserts termination is not in the child's best interests. The child's best interests require a parent to "affirmatively assume[] the duties encompassed by the role of being a parent." Iowa Code § 600A.1(2). This includes "the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life." *Id.* Our supreme court has also borrowed from the statutory best-interests framework in Iowa Code section 232.116(2) in private termination proceedings. *See In re A.H.B.*, 791 N.W.2d 687, 690 (Iowa 2010). Applying that framework, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

On review, we agree with the juvenile court that termination is in the child's best interests. The father has made few if any meaningful efforts to establish a safe and nurturing home for his child. In contrast, the adoptive parents continue to provide for the child's current and future living and medical needs. The father's willful ignorance of the child's notable health issues and his lack of concern for the child's exposure to dangerous substances highlights the child's need for

termination and adoption to achieve permanency, stability, and safety.  We affirm the juvenile court's conclusion that termination was in the child's best interests.

**VI.    Disposition**

We affirm the termination of both the mother's and the father's parental rights.

**AFFIRMED ON BOTH APPEALS.**