# IN THE COURT OF APPEALS OF IOWA

No. 24-2070
Filed December 3, 2025

IN RE THE MARRIAGE OF JORDAN A. PRUSHA
AND MORGAN L. PRUSHA

Upon the Petition of
JORDAN A. PRUSHA,
    Petitioner-Appellee,

And Concerning
MORGAN L. PRUSHA,
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Mills County, Craig M. Dreismeier, Judge.

A former spouse appeals from a decree of dissolution of marriage, claiming the district court improperly enforced a premarital agreement, wrongly awarded physical care of the parties' minor children to her former spouse, and asserts she should have been awarded child support and spousal support. **AFFIRMED.**

Michael J. Winter, Council Bluffs, for appellant.

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellee.

Considered without oral argument by Schumacher, P.J., and Badding and Langholz, JJ.

**SCHUMACHER, Presiding Judge.**

Morgan Prusha appeals the district court's order upholding the validity of a premarital agreement. Morgan further appeals the dissolution decree entered by the court, arguing the district court improperly granted Jordan physical care of their two minor children, and asserts that the district court should have awarded her child support and spousal support. Morgan also requests an award of appellate attorney fees.

## I.    Background Facts and Prior Proceedings

Morgan and Jordan began dating in 2010. Morgan moved into Jordan's home in Omaha about six months after they began dating. Jordan had previously been married and had a one-year-old son. Jordan maintained he did not want to get married again. Jordan and Morgan had two children together, H.P., born in 2013, and G.P., born in 2014. Jordan sold his Omaha home and bought a home in Glenwood in March 2014 that Morgan and Jordan lived in throughout their marriage. The home was titled in Jordan's name only, and Jordan used a VA loan to obtain the home. Morgan made various improvements while living in the home, but her name was never added to the deed.

After living together for approximately six years and the birth of two children, Jordan agreed to marriage only if the parties entered into a premarital agreement. Jordan retained a lawyer to prepare the agreement, provided Morgan a copy of the proposed agreement, and advised her to visit with an attorney. Jordan presented Morgan with the agreement thirteen days before the wedding.[1]  Morgan chose not

---

[1] The parties dispute the exact number of days between the time Jordan presented Morgan with the agreement and the wedding. According to Morgan's brief, she

to review the agreement with a lawyer. Instead, she looked it over with a neighbor who had no legal training. After reviewing the agreement, Morgan understood that she either signed it or there would be no marriage. Morgan signed the agreement, and in September 2016, Morgan and Jordan were married. Morgan acknowledged having sufficient time to review the agreement, that she could have reviewed such with a lawyer, and that she had access to funds to pay for a lawyer.

During the marriage, Jordan was the financial provider for the family and spent time growing his business. Morgan worked as a kennel helper at a vet clinic making around $18 an hour when the parties met. Morgan left this employment after becoming pregnant with the parties' first child and spent a portion of the marriage working as a stay-at-home mother. Morgan began employment outside the home again after the children were in school. In addition to the parties' two children, Morgan also assisted with care for Jordan's child from his first marriage. Among other responsibilities, Morgan was responsible for doctor appointments, grocery shopping, and transporting the children to their events.

In June 2023, less than seven years after the marriage, Jordan filed a petition for dissolution of marriage. A few months later, Morgan was removed from the family home by law enforcement. In his original petition, Jordan requested that the court place the children in the parties' joint legal custody and joint physical care. Morgan answered, resisting the request for joint physical care and asked the

---

was first shown the agreement ten days before the wedding, while Jordan claims it was thirteen days before. Based on the record, along with Morgan's testimony, she received the agreement on August 29, 2016, and the wedding was on September 10, 2016. While the difference is insignificant, based on this record, there was a thirteen-day period between the time Morgan received the agreement and the wedding.

court to award her physical care. Jordan later amended his petition, requesting the court award him physical care of the children. And Morgan later amended her answer to include a claim for spousal support.

In September, Morgan filed a "Motion to Set Aside Antenuptial Agreement" asking the court to determine whether the agreement was valid or whether it was unconscionable and signed under duress and undue influence. Jordan resisted.

The district court entered an order on temporary matters the following month. The court granted the parties joint legal custody, shared physical care of the children, and ordered Jordan to pay $728.57 per month in child support. The court also ordered, "during the time either parent is caring for the children, they will not consume alcohol nor operate a motor vehicle while drinking when the children are in the vehicle."

In May 2024, Jordan filed an application to show cause, alleging Morgan had violated the October 2023 temporary order. Jordan alleged Morgan had refused to return the children to his care and that Morgan had violated the order by consuming alcohol while the children were in her care. Jordan also filed a motion to modify the temporary order, as Morgan had been arrested for domestic abuse assault against Jordan two days prior. At the time of the assault, Morgan was intoxicated, and the parties' children witnessed the assault.

The district court modified the temporary order. The court stated: "It may not be completely accurate to indicate Morgan is the source of all the issues; however, it does appear that her actions at this time are a major contributing factor to consider in why shared physical care is not appropriate." The court placed temporary physical care of the children with Jordan, terminated Jordan's child-

support obligation to Morgan, and highlighted the no-contact order imposed on Morgan in the criminal case.

In a bifurcated proceeding, the parties litigated the validity of the prenuptial agreement. The court enforced the majority of the premarital agreement, striking the portions of paragraphs 9 and 18 that dealt with spousal support under Iowa Code section 596.8(2) (2023).

Trial was held over two days in August and October 2024, after which the district court entered a decree dissolving the parties' marriage, awarded the parties joint legal custody, and placed the children in Jordan's physical care. The court rejected Morgan's request for spousal support. The court determined Jordan's annual income to be $159,347.79. While Morgan reported no income from 2014 through 2019 as a stay-at-home mother, the court imputed her annual income as $33,280. Morgan received cash of $74,351.60 from the dissolution decree. The court also required Jordan to obtain and pay for Morgan's major medical, health, dental and/or vision insurance for a period of five years upon completion of the divorce, in compliance with the prenuptial agreement. And Morgan was awarded a 2022 vehicle free of any indebtedness. Morgan timely filed a motion to reconsider under Iowa Rule of Civil Procedure 1.904(2), which the district court denied. Morgan appeals.

## II.     Standard of Review

"Dissolution proceedings are equitable actions, which we review de novo." *In re Marriage of Shanks*, 758 N.W.2d 506, 510 (Iowa 2008). "Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses." *In re Marriage*

*of Brown*, 776 N.W.2d 644, 647 (Iowa 2009) (citation omitted). Furthermore, "the general rule is that issues concerning the validity and construction of premarital agreements are equitable matters subject to our de novo review." *Shanks*, 758 N.W.2d at 511. "The party challenging the validity of the agreement bears the burden of proving it is unenforceable." *In re Marriage of Snyder*, No. 21-0438, 2022 WL 610322, at *2 (Iowa Ct. App. Mar. 2, 2022).

"Our review of matters involving child custody and child support is de novo." *Thorpe v. Hostetler*, 949 N.W.2d 1, 4 (Iowa Ct. App. 2020). Likewise, our review of spousal support is de novo, but "we accord the trial court considerable latitude." *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015) (quoting *In re Marriage of Olson*, 705 N.W.2d 312, 315 (Iowa 2005)). "We will disturb the trial court's ruling order 'only when there has been a failure to do equity.'" *Id.* (quoting *Olson*, 705 N.W.2d at 315).

## III.    Discussion

Morgan raises several claims on appeal. First, she argues the premarital agreement is unenforceable. She also asserts the district court improperly granted Jordan physical care of their two children. She claims the district court should have awarded her child support and spousal support. And she requests appellate attorney fees.

### A.    Validity of Premarital Agreement

Prenuptial agreements "are favored in the law and should be construed liberally to carry out the intention of the parties. Courts will uphold them if they are fair between the parties and fairly, freely and understandingly entered into." *In re Marriage of Van Brocklin*, 468 N.W.2d 40, 45 (Iowa Ct. App. 1991).

Under Iowa Code section 596.8, a party challenging a premarital agreement can pursue three grounds to demonstrate unenforceability: (1) by showing that they did not enter the agreement voluntarily; (2) showing the agreement was unconscionable when executed; and (3) showing they were not provided a "fair and reasonable" disclosure of the other spouse's property and obligations, and "did not have, or reasonably could not have had, an adequate knowledge of the" other spouse's financial assets and obligations. Morgan challenges the enforceability of the agreement on the first two grounds.

1.      Voluntariness

A premarital agreement can be involuntary under two avenues: duress and undue influence. *See Shanks*, 758 N.W.2d at 512. Duress exists where "(1) one party issues a wrongful or unlawful threat and (2) the other party had no reasonable alternative to entering the contract." *Id.* "Undue influence is influence that deprives one person of his or her freedom of choice and substitutes the will of another in its place." *In re Marriage of Spiegel*, 553 N.W.2d 309, 318 (Iowa 1996), (*superseded by statute on other grounds as recognized in Shanks*, 758 N.W.2d at 512).

Morgan argues she acted under duress because she believed she had no alternative since she either had to sign the agreement or there would be no marriage. According to Morgan, Jordan told her on the eve of the wedding: "You sign it tonight or everybody that just left and everybody that's been here and has helped you does not come back tomorrow. We do not get married." Our courts have made clear that such an ultimatum is not improper. *See id.* ("A.J.'s threat

here, albeit unspoken, was he would not marry Sara if she did not sign the prenuptial agreement.  We find this threat neither wrongful nor unlawful.").

Furthermore, "temporal proximity to the wedding day does not render an agreement unenforceable so long as the party has adequate time to meaningfully consider the contract."  *Snyder*, 2022 WL 610322, at *2; *see also In re Marriage of Elam*, No. 03-0221, 2004 WL 370247, at *2 (Iowa Ct. App. Feb. 27, 2004) ("Even if Ed had only seen the agreement the day prior to the wedding, as he claims, such would be insufficient, standing alone, to invalidate it.").  Morgan points out Jordan's ultimatum was made on the eve of the wedding, when "the house had been decorated, the invitations had gone out and that people had come from out of town to attend the wedding."

But that does not mean Morgan had no alternative but to sign the agreement.  Indeed, "cancelling the wedding is generally a reasonable alternative despite the temporal proximity to the wedding day and potential social embarrassment cancellation may cause."  *Snyder*, 2022 WL 610322, at *3; *see also Spiegel*, 553 N.W.2d at 318 ("[W]e do not think social embarrassment from the cancellation of wedding plans, even on the eve of the wedding, renders that choice unreasonable.").  Contrary to Morgan's argument, she was not forced to sign the agreement on the eve of the wedding.

Morgan also fails to establish undue influence.  Jordan presented Morgan with the agreement thirteen days before the wedding, and thus, Morgan had time to review the agreement and obtain independent legal counsel.  Morgan admitted she had "plenty of time" to contact an attorney.  In any event, Morgan voluntarily chose not to review the agreement with legal counsel, even after Jordan told

Morgan to get a lawyer to advise her on the agreement. As a result, Morgan failed to establish that she entered the agreement involuntarily.

2.     Unconscionability

"The concept of unconscionability includes both procedural and substantive elements." *Shanks*, 758 N.W.2d at 515. Procedural unconscionability generally requires "'sharp practices[,] the use of fine print and convoluted language,' as well as 'a lack of understanding and an inequality of bargaining power.'" *Id.* (alteration in original) (citation omitted)). Substantive unconscionability is found where "the terms of the agreement are so harsh or oppressive 'such as no [person] in [their] senses and not under delusion would make' such a bargain." *Id.* at 516 (alterations in original) (quoting *Casey v. Lupkes*, 286 N.W.2d 204, 207 (Iowa 1979)).

"In determining procedural unconscionability, we consider several factors, including the party challenging the agreement's opportunity to seek independent counsel, the 'relative sophistication of the parties in legal and financial matters,' the temporal proximity of the agreement to the wedding day, and the use of confusing or technical language." *Snyder*, 2022 WL 610322, at *4 (quoting *Shanks*, 758 N.W.2d at 517). Morgan had the opportunity to seek legal counsel but elected not to do so. Morgan did not sign the agreement until the night before the wedding, but Jordan had presented her with the agreement thirteen days before the wedding. While Morgan claims the legal language in the agreement was "mind boggling," she provides no further explanation why she viewed it as such. *Id.* ("[W]hile both parties agreed John was more financially savvy than Beth, the agreement did not use highly technical or confusing language, nor did it utilize 'sharp practices' like fine print."). Morgan cannot avoid enforcement of the

agreement simply because "[she] felt that since they would never get divorced, the language was irrelevant."

The agreement is not substantively unconscionable. Morgan claims, "[t]he agreement is unconscionable in that it awards all of the assets including the home for which Morgan had made improvements exclusively to Jordan." But as our supreme court has stated, "premarital agreements are typically financially one-sided in order to protect the assets of one prospective spouse. Courts must resist the temptation to view disparity between the parties' financial circumstances as requiring a finding of substantive unconscionability." *Shanks*, 758 N.W.2d at 516. Rather, "the focus of the substantive unconscionability analysis is upon whether 'the provisions of the contract are mutual or the division of property is consistent with the financial condition of the parties at the time of execution.'" *Id.* (quoting *Spiegel*, 553 N.W.2d at 316). That Jordan leaves the marriage in a better financial position than Morgan because of the premarital agreement does not render it unconscionable.

3. Notarization

The parties also dispute when Morgan signed the agreement. The agreement lists September 9, 2016, as the date of execution and dates Jordan's signature September 6, but it does not provide a date for Morgan's signature. Morgan argues she signed the agreement on September 9, the night before the wedding, and that a notary was not present when she signed. Thus, Morgan believes the agreement was notarized without her being present. Jordan asserts that Morgan's arguments are "red herrings" because Morgan admitted it was her signature on the agreement, and she signed the agreement before the parties

married. We note that Iowa Code section 596.4 does not require the parties' signatures in a premarital agreement to be notarized. *See In re Estate of Rhoten*, No. 18-0753, 2019 WL 1056831, at *1 (Iowa Ct. App. Mar. 6, 2019) (discussing a premarital agreement where only one party's signature was in the presence of a notary). Therefore, even if the agreement were not properly notarized, this would not render it unenforceable.

### B. Physical Care

If joint legal custody is awarded to both parents, as here, the district court "may award joint physical care to both joint custodial parents upon the request of either parent." Iowa Code § 598.41(5)(a). Physical care determinations are not resolved based on the perceived fairness to the spouses involved. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Rather, our primary consideration focuses on what is in the best interest of the child. *Id.* Ultimately, the objective of a physical-care determination is to put the children in the environment most likely to provide physical and mental health, and to develop social maturity. *Id.*

On appeal, Morgan argues she should have been awarded physical care of the children. According to Morgan, she was the primary caretaker of the children before the divorce and noted the relationship she has with the children and the community. Morgan claims the district court focused too much on what happened after the divorce petition was filed and "failed to give proper weight to the history of the caregiving of the children." While Morgan's role as the primary caregiver during the marriage was important for the district court to consider, that factor does not determine per se that physical care should have been awarded to her. *In re Marriage of Fennell*, 485 N.W.2d 863, 865 (Iowa Ct. App. 1992) ("The fact a parent

was the primary caretaker prior to separation does not assure he or she will be the custodial parent."). The district court considered various factors in its order including "Morgan's traditional role in caring for the children before the parties separated." The district court also noted the law enforcement contact since separation as "a bit alarming" as well as Morgan's violations of the temporary order. After considering numerous factors, the district court found:

> Jordan is the more stable parent. Jordan will follow this court's orders. Jordan has been the parent who has been more supportive of the other parent's relationship with the children. He will reach out and attempt to communicate with Morgan about the children rather than simply make no effort. This court is convinced he will be the parent who will continue to support the children's relationship with the children going forward and as such, he should be awarded primary care of the children.

Under these facts, we agree with the district court that the children's best interests are best served by awarding physical care to Jordan.

### C. Child Support

Having determined that the district court did not err in awarding physical care of the parties' children to Jordan, we decline to award Morgan child support. *In re Marriage of Cook*, No. 23-0727, 2024 WL 707009, at *2 (Iowa Ct. App. Feb. 21, 2024) ("Iowa's child support framework does not allow a court to order a custodial parent to pay child support to a noncustodial parent. . . . When one parent has physical care, the guidelines do not contemplate the parent with physical care paying support to the other parent.").[2]

---

[2] And Morgan has waived the child support issue by failing to make an argument on the issue or citing any authority on the issue in her brief. Iowa R. App. P. 6.903(2)(a)(8) ("Failure to cite authority in support of an issue may be deemed waiver of the issue."); *State v. Jackson*, 4 N.W.3d 298, 311 (Iowa 2024) ("A party forfeits an issue on appeal when the party fails to make an argument in support of

**D.    Spousal Support**

Morgan argues the district court should have awarded her spousal support.

> "[W]e accord the trial court considerable latitude" in spousal support decisions.  *Gust*, 858 N.W.2d at 406 (quoting *Olson*, 705 N.W.2d at 319).  As a result, "[w]e will disturb the trial court's order 'only when there has been a failure to do equity.'"  *Id.* (quoting *Olson*, 705 N.W.2d at 319).  There is no absolute right to spousal support. *In re Marriage of Hansen*, No. 17-0889, 2018 WL 4922992, at *8 (Iowa Ct. App. Oct. 10, 2018).  Further, "[f]inancial need, in and of itself, is not sufficient reason to justify an award of spousal support." *In re Marriage of Gutcher*, No. 17-0593, 2018 WL 5292082, at *5 (Iowa Ct. App. Nov. 7, 2018).  We look to the particular facts of the case, recognizing that "precedent may be of little value in deciding each case."  *Gust*, 858 N.W.2d at 408.  When considering an award of spousal support, we are guided by the factors set out in Iowa Code section 598.21A(1), including the length of the marriage, age and physical health of the parties, property distribution, earning capacity, and the ability of the party seeking an award to earn enough to support a "standard of living reasonably comparable to that enjoyed during the marriage."

*Snyder*, 2022 WL 610322, at *5 (alterations in original).

"[O]ur precedents have recognized four forms of spousal support deemed equitable: traditional, reimbursement, rehabilitative, and transitional."  *In re Marriage of Sokol*, 985 N.W.2d 177, 185 (Iowa 2023).  While Morgan requested spousal support from the district court, she did not provide an amount or a duration.  Morgan points out that she stayed at home with the children during the marriage so that Jordan could build his business.  According to Morgan, "[t]he sacrifices she made so that [Jordan] could advance his business and increase his income should be rewarded with alimony to continue as long as the marriage lasted."

---

the issue. . . .   A party forfeits an issue on appeal when the party fails to cite any authority in support of the issue." (internal citations omitted)).

Morgan asks us to determine the amount of spousal support and length of time it should be paid, or alternatively, to remand this case to the district court with instructions to award spousal support for a length of time and in an amount that would be equitable. Jordan resists a remand, arguing, "[a] remand would effectively be a new trial with new evidence. Such a remedy is extraordinary and not justified." Jordan also highlights the district court's finding that Morgan provided no evidence on the amount or the length of her requested spousal support.

The parties separated short of seven years of marriage, as described by the district court as a "short-term" marriage. Morgan concedes, and we agree, traditional spousal support is not appropriate. *Id.* ("Generally, only 'marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support.'" (quoting *Gust*, 858 N.W.2d at 410–11)). But Morgan contends that she should have been awarded either rehabilitative or reimbursement spousal support. Morgan does not explicitly seek transitional support.

"Rehabilitative spousal support is 'a way of supporting an economically dependent spouse through a limited period of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting.'" *In re Marriage of Becker*, 756 N.W.2d 822, 826 (Iowa 2008) (quoting *In re Marriage of Francis*, 442 N.W.2d 59, 63 (Iowa 1989)). Morgan offered no evidence to the district court, nor has she argued on appeal, that following the marriage, she has sought any reeducation or retraining or has plans to do so. Morgan is therefore not entitled to an award of rehabilitative spousal support.

"Reimbursement spousal support allows the spouse receiving the support to share in the other spouse's future earnings in exchange for the receiving spouse's contributions to the source of that income." *Id.* "[R]eimbursement alimony 'is designed to give the "supporting" spouse a stake in the "student" spouse's future earning capacity, in exchange for recognizable contributions to the source of that income—the student's advanced education.'" *In re Marriage of Pazhoor*, 971 N.W.2d 530, 544 (Iowa 2022) (quoting *Francis*, 442 N.W.2d at 63).

Reimbursement spousal support is awarded in that limited circumstance. *Gutcher*, 2018 WL 5292082, at *4 ("Reimbursement support applies only in 'situations where the marriage is devoted almost entirely to the educational advancement of one spouse' and 'there has not been enough time for the parties to receive the benefit from the educational advancement through tangible assets accumulated during the marriage.'" (quoting *In re Marriage of Erpelding*, No. 16-1419, 2017 WL 2670806, at *6 (Iowa Ct. App. June 21, 2017), (*vacated on other grounds by In re Marriage of Erpelding*, 917 N.W.2d 235 (Iowa 2018))); *In re Marriage of Jenn*, No. 18-1458, 2019 WL 5424938, at *2 (Iowa Ct. App. Oct. 23, 2019) ("This form of support is awarded when the marriage dissolves shortly after one of the parties obtains a professional degree or licensure with the financial support from the other. It is not justified by one spouse's support of the other's business ventures." (internal citations omitted)). Because the parties' marriage was not devoted to Jordan obtaining advanced education, an award of reimbursement spousal support for Morgan is not proper.

While Morgan does not explicitly ask for transitional support on appeal, the district court recognized that "Morgan is requesting transitional alimony." With this

in mind, we consider whether Morgan should be awarded transitional support. *Sokol*, 985 N.W.2d at 186 ("[T]he generally recognized categories of spousal support are not mutually exclusive."). "[T]ransitional spousal support is warranted where the recipient spouse may already have the capacity for self-support at the time of dissolution but needs short-term assistance in transitioning to single life." *Id.*

Despite the enforcement of the premarital agreement, Morgan did not walk away from the marriage empty handed. The district court awarded Morgan the parties' 2022 GMC Yukon and $74,351.60, which included the $20,000 the premarital agreement required Jordan to pay Morgan. Under the premarital agreement, the district court also ordered Jordan "to obtain and pay for Morgan's major medical, health, dental and/or vision insurance for a period of five years upon completion of the divorce." And Morgan is employed, she testified she can work full-time, and the district court determined her annual income to be $33,280. Finally, many of the expenses Morgan identified presupposed she would have physical care of the children. But as the district court concluded: "[Morgan] will not have a car payment, day care payment or health insurance payment for five years." Based on these facts, we find that an award of transitional support was not warranted.

We note that "the generally recognized categories of spousal support are not mutually exclusive, [but] they are the exclusive categories of spousal support our precedents have recognized as equitable." *Id.* But we conclude, as did the district court, that Morgan is not entitled to spousal support under any of the four categories. *Gutcher*, 2018 WL 5292082, at *5 ("We should not be quick to

recognize new categories of spousal support. Nor should we be lax in applying the generally-recognized categories to the facts of a particular case.").

As noted by the district court, there is a discrepancy in the parties' incomes. But after weighing the relevant factors and this appellate record, we affirm the denial of spousal support to Morgan.

### E.    Appellate Attorney Fees

Morgan requests an award of attorney fees on appeal. "An award of attorney fees is not a matter of right, but rests within the court's discretion and the parties' financial positions." *In re Marriage of Liebich*, 547 N.W.2d 844, 851 (Iowa Ct. App. 1996). We "consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *Id.* Considering these factors, we decline to award appellate attorney fees to Morgan.

**AFFIRMED.**